*Windham,*
*February,*
*1826.*

CHARLES HOLDEN, SYLVESTER HOLDEN, MARVIN HOLDEN, BARNET W. JOHNSON *and* POLLY *his wife,* JOSEPH L. BLANDEN *and* ASENETH *his wife, and* JOHN BLANDEN *and* SALLY *his wife, heirs at law of* CHARLES HOLDEN, *deceased,* orators, *vs.* THEOPHILUS CRAWFORD, defendant.—*IN CHANCERY.*

A court of equity will, in favour of heirs, relieve against a contract and sale of real estate, where there was a great disparity in the mental capacities of the contracting parties, and where the inadequacy of consideration was so gross as to leave no doubt that the vendor must have been labouring under the effect of some strange delusion in his own mind, in relation to the subject; although the grantor was not, strictly speaking, a *non compos mentis,* and although it do not distinctly appear, that the bargain was induced by false and fraudulent affirmations on the part of the purchaser.

If the testimony of an interested witness be taken and regularly filed, to be used in chancery, and the opposite party do not move to suppress it, the exception, if taken on the trial, will be sustained; but, in that case, the party offering the testimony, will be entitled to an opportunity to remove the interest, if he can, and still avail himself of the testimony of the witness, when restored to his competency.

CHARLES HOLDEN, in the year 1820, being about the age of seventy-two years, was a very weak minded man. Though in the earlier part of his life he had been an industrious, discreet person, and had acquired a real estate in Westminster, of the value of $2500,00, which he still possessed, yet, for the last twenty years or more, he had led a roving sort of life, absenting himself much from his family, and going to the city of *New-York* and other distant places, where he engaged in peddling and other small traffick, and gambled in lotteries, having imbibed an impression that he could, by means of dreams, divine the fortunate numbers. He left his business at home principally to the management of his wife and family, sometimes appearing to be fortunate in his speculations, and at other times the reverse. In October, 1813, such were his habits and practices, that the selectmen and civil authority of Westminster complained to two justices of the peace, that by absenting himself from his wife and family, and by gambling and idleness, he was so spending and lessening his estate, as thereby to expose himself and family to want, and the town of Westminster to their support. This, however, was said to have been done at the instigation of his family. But the justices to whom the complaint was exhibited, having heard the case, did adjudge that the said *Charles Holden* came within the description, true intent and meaning of the *ninteenth* section of the *act, defining what shall be deemed and adjudged a legal settlement, &c. and for the punishment of idle and disorderly persons,* (*Stat.* 369, *ch.* 47, *sec.* 19) and they thereupon appointed one *Charles Pierce* guardian over his estate. *Pierce* accepted of this appointment, and made an appraisal of the estate, but he never took charge of the same nor interfered with the bargains of Holden and his family. And, in June, 1815, he moved from the state, and has never since returned, leaving Holden in the possession and management of his property, as he had been before. While things were in this situation, in May, 1820, *Charles Holden,* understanding that the

defendant owned lands in *Illinois*, applied to him to purchase his real estate in Westminster, and to convey to him his lands in *Illinois*, and pay a balance in money, saying that he should want at least five hundred dollars in money. The said Charles, with some of the members of his family, and the defendant, met on the next day, and concluded a bargain, in pursuance of which, Holden conveyed to the defendant all his real estate in Westminster; and the defendant, as the consideration therefor, conveyed to said Holden *eight* quarter sections of land, promiscuously situated in the tract set apart for military bounties in *Illinois*, and also paid him $500,00 in money, it being the expressed intention of Holden at the time of the contract, to settle on the Illinois lands, with a view to bettering his property. These quarter sections of land were, on an average, sixty miles from settlements, and the average market price thereof at the time of the contract, did not exceed sixty dollars the quarter section. The defendant also gave Holden money to pay the taxes due on the lands up to the time of the contract. The defendant went into possession of a part of the estate in Westminster immediately after the contract; and at the time of the commencement of the present suit, had an action of ejectment pending against a part of the orators in this bill, (the said Charles Holden having deceased) to recover possession of the residue.

The orators, being the heirs at law of said *Charles*, sought by their bill, to have the contract between him and the defendant rescinded, and that the defendant be decreed to convey *to them* the said lands in Westminster, and account for the rents and profits thereof so long as he had possessed the same, or any part thereof, on such terms as should be just and equitable, and that he be perpetually enjoined against further prosecuting his said action of ejectment, and for other and further relief.

The defendant, in his answer, admitted the contract, but denied the grounds of relief, and the cause was set down for argument on the bill, answer and traverse. [a]

*Everett*, for the orators, insisted that they were entitled to the relief prayed for, on the following grounds, which he contended were supported by the facts appearing in the case, viz:

[margin note: *Windham,* February, 1826. Holden *et al.* *vs.* Crawford.]

---

[a] NOTE.—In the course of reading the proofs, the orators offered the testimony of a witness who was recognized for an appeal taken by the orators, in the action of ejectment now pending, for the recovery of a part of the same farm, in favour of the defendant against several of the orators. And the defendant objected to the testimony for that cause.

For the orators, it was insisted that the objection came too late ; that the defendant ought to have moved the Court, before the trial, to suppress the deposition.

*Per Curiam.*—The regular course would have been, to have moved the Court to suppress the testimony of the witness. But as the fact of the witness being recognized as stated by the defendant, is not denied, the Court are inclined to the opinion, that the testimony ought not to be read.

But the orators will yet be entitled to an opportunity to remove the interest, and avail themselves of the testimony, if they choose, the objection not having been seasonably taken.

Windham,
February,
1826.

Holden et al.
vs.
Crawford.

1. That *Charles Holden*, at the time of the contract, was not of sound mind, but incapable of contracting, and the contract is therefore void.

And in support of this position, he cited *Fonb.* 63.—*ib.* 65, note.—1 *Blac. Com.* 304.—3 *Atk.* 168.—6 *Vezey,* 65.—12 *do.* 445.—*Statute* 356, concluding, that the same state of mind which would authorize a commission, &c. will avoid the contract.

2. If the case does not show a legal incapacity, it shows a case of weakness of understanding, from which fraud will almost be presumed, and that it is inferrable from the inequality of the parties, and inadequacy of consideration.

Though old age alone is not sufficient ground to presume fraud, (1 *Vez.* 19, 117, 63) and though weakness of mind may not be sufficient to support a commission of lunacy, it furnishes a strong ground of suspicion, that persons in those states executing conveyances, are acted upon by improper influence. And where fraud or surprise *can be imputed,* or collected from the circumstances, equity will relieve.—1 *Fonb.* 60, *cited in Wright* vs. *Booth.—Tothill,* 101, 102.—2 *Cha. Cases,* 103.— *Finch,* 161.—2 *P. Wms.* 270.—3 *do.* 130.—2 *Vern.* 189.—2 *Atk.* 324.—2 *Vez.* 407.—1 *Fonb.* 116.—6 *Bro. Ch. R.* 9.—2 *do.* 167. —10 *Vez.* 223, 52.—12 *do.* 373.—13 *do.* 103.

3. That, in addition to the second point, the defendant took advantage of the weakness of mind of said *Holden,* and by artful and false representations, obtained the contract.

4. That at the time of the contract, Holden was under guardianship, under the 19th section of the pauper act.

The act declares all contracts of such ward to be null and void. And the only mode by which the guardianship could be dissolved, is under the provision of the 14th section of the same act.

*Bradley* and *Hubbard,* contra—insisted, that neither position taken by the orators, as sustained by the proofs, furnished a ground for rescinding the contract. Old age is no sufficient ground, (1 *Vez.* 19) and equity does not measure the capacities of men any more than law. *Pow. on Con.* 30, 31.

On the subject of inadequacy of consideration, they cited 5 *Vez.* 845.—9 *ib.* 246.—10 *ib.* 219, 474.—13 *ib.* 103.—14 *ib.* 243.—18 *ib.* 312.

That the misrepresentations relied upon are not of a nature to avoid the contract.—18 *Vez.* 11.—10 *ib.* 475.

Law, they said, avoids *in toto,* and equity does the same where law would do it. In other cases, where equity interferes, it must be in the power of the Court to reinstate the parties ; (2 *Vez.* 289, 408.—1 *ib.* 206.—8 *ib.* 283.—14 *ib.* 91, 243) and *non constat,* that it is in the power of the orators to reconvey to the defendant the lands in Illinois.

The appointment of a guardian by the justices, was no evidence of want of capacity. In that case the application must have been to the probate court.—1 *Stat.* 403, *Comp. of* 1807.

*Windham,*
*February,*
1826.

Holden *et al.*
*vs.*
Crawford.

This guardianship, (if not originally void for irregularity,) was under the 19th section of the pauper act. Under that section, when the owner of the estate in ward returns, he is entitled to it. No application to the county court is necessary. The legal presumption is, that *Pierce* surrendered the estate on the return of Holden. If not, the removal of Pierce from the state in 1815, was a virtual resignation of the trust.

After a full hearing upon the bill, answer and traverse, with all the exhibits of briefs, and testimony, the grounds of the decision and the decree of the Court, were concisely stated by

HUTCHINSON, Chancellor, as follows :

Several grounds for a decree have been urged by the orators, among which, one is, that the deed from *Holden* the elder to *Crawford*, is inoperative, as against the heirs, on account of the guardianship under which he laboured. This is answered by the affirmance, that the guardianship was illegal and void, and if not, it had ceased by the departure of both guardian and ward from the state, by the restoration of the property to the ward, &c.

Were the cause to be decided upon this point wholly, the Court might not be perfectly agreed in their opinion. Facts might exist, which would furnish good reason for vacating the guardianship, and yet the same remain in force until vacated. And I, for one, should like, before a decision upon this point, to see a statute which is not before me, and learn some further facts about the residence. But the Court will not decide in favour of the orators upon this ground. Nor will the Court treat the cause as if *Holden* were properly a *non compos mentis*, for the testimony does not sufficiently prove him such at that time. Nor do the Court decide, that the respondent was guilty of false and fraudulent affirmations, in order to induce Holden to deed his farm and close the contract. The orators contend they have adduced evidence tending to prove this. The Court have not taken time to compare and balance the testimony of both parties upon this point, as they would do, were the cause to turn upon it.

There is one ground on which the Court are satisfied to decree against the respondent. It appears very plain, that *Holden* was a very weak man, easily fascinated with some visionary project, and had but a very incorrect idea of the value of property. This Mr. *Crawford* must have known. The professed object of *Holden* was not to turn himself and family out of house and home, but to enlarge his landed property, and still retain a home. His weakness left him supposing he could effect this by changing his farm and buildings here for a tract of land, much larger to be sure, but lying sixty miles into the wilderness, in *Illinois*, and for about money enough to transport him and his effects there. A project of this kind is always impracticable, unless a sufficient number, including an assortment of mechanicks, with property to erect mills, go at once and form some little society to relieve each others wants, while the surrounding country

Windham,
February,
1826.

Holden et al.
vs.
Crawford.

could be settled.   Moreover, according to the testimony, *Holden* received less than half the value of his property.   The average appraisal of *Holden's* property deeded to the respondent, by a multitude of witnesses on both sides, would exceed $2500 ; while, reckoning the *Illinois* land at the fair market price here, which is the only price of which *Holden* could have been at all cognizant, or which a man in his circumstances could ever realize, *Holden* received less than $1100 for his property.   There is, therefore, no equality in this contract; no equality of consideration, no eqaulity in the capacity of the contracting parties; none in the knowledge of the value of the property.   Mr. *Crawford* must have known that *Holden* was deceiving himself with regard to the value of the property.   It was an unconscionable bargain, one that the respondent ought not to have made, one that he cannot equitably retain.   The willingness proved of Mr. *Crawford* to rescind the bargain, afterwards, does not help the matter ; for he must have then known that the weakness of *Holden*, and his ignorance of the value of the *Illinois* property, still continued, and that his infatuating charm remained unbroken.

When the son returned, who knew the value of the property, there could be no rescinding of the contract, without application to this Court.

The Court, therefore, decree, that the costs of this suit be taxed in favour of the orators against the respondent ; that the interest be cast upon the $500 paid by said *Crawford* to *Charles Holden* the deceased, from the time of payment till this time, and be added to the principal ; that from the amount thus formed there be deducted said taxable costs ; and that, on the orators paying the balance to the clerk of our said Court, for the benefit of said *Crawford*, on or before the first day of the next term of this Court in February next, at this place, and also making, executing, procuring and delivering to said clerk, for the benefit of said *Crawford*, his heirs and assigns, good and valid deed or deeds, re-vesting in him all the title to said lands in *Illinois*, conveyed by said *Crawford* to said *Holden*, as set forth in said bill, with satisfactory evidence that the same are free from taxes assessed since the giving of said deed from said *Crawford* to said *Holden ;* or, instead of said deed or deeds, shall pay to said clerk, for the benefit of said *Crawford*, the sum of five hundred and sixty dollars, being the value of said lands as now estimated by the Court, together with said sum paid by said *Crawford* to said *Holden*, for taxes, being $31, and interest on the same to this time, the said *Crawford* shall, on or before the third day of the said next term of this Court, execute and deliver to the said clerk, for the benefit of said orators, a good and valid quit claim deed, conveying to the heirs of the said *Holden* the elder, now deceased, all the lands in *Westminster*, so conveyed to him the said *Crawford*, by said *Holden*, as set forth in said bill, free from all incumbrance accruing from any act or neglect of said *Crawford* since his said deed from said *Holden*, to hold to the said heirs and their heirs and assigns forever ; and that, upon a

compliance by the orators with this decree, the said *Crawford*, his heirs and assigns, be forever enjoined from any further pursuit of the said action of ejectment, or any other suit in law or equity, for the recovery of said lands in Westminster.

*Horace Everett, Daniel Kellogg* and *Asa Keyes*, for the orators.

*Wm. C. Bradley, P. White* and *Jona. H. Hubbard,* for the defendant.