## NATHANIEL DOUGHTY *v.* ENOCH DOUGHTY.

Defects in an answer are not cured by the not excepting to it. Its defectiveness will have its influence on the decision of the cause, though exceptions to it were not taken.

On the question of the mental competency of the party to make a division, with his co-partner and co-tenant, of a large personal and real estate, the unconscionable character of the division will be considered in aid of the proof of incompetency.

It is not necessary that a party should have been absolutely *non compos* to entitle him to relief in such a case.

One of the parties to deeds dividing a large personal and real estate between them had been, by long intemperance and severe sicknesses, producing frequent convulsions, reduced to a very low state of weakness of body and imbecility of mind; the other party was his elder brother, who had long been a partner in business with him, and thus in a relation to exercise great influence over him; and the bargain was such as no honest and fair man would think of proposing or ought to be willing to accept. The deeds were declared to be fraudulent and void.

Relief in such cases does not depend on the question whether the precise degree of imbecility charged in the bill is proved. Imbecility calling for relief under the circumstances may be proved, and acted upon by the court, though it be not the degree of imbecility charged.

The lapse of twelve years before the bill was filed to set aside the deeds was held not to be, under the circumstances of the case, sufficient to establish the deeds.

The bill, filed December 2, 1845, states, that on the 6th of February, 1819, the complainant, Nathaniel Doughty, and the defendant, Enoch Doughty, being brothers, entered into a general partnership in buying and selling real estate, and in cutting oak and pine wood for market, and making charcoal, and in building vessels and sailing and selling them, cutting and sawing lumber, owning a saw-mill, and also the business of farming; and that the partnership was so general that half of the furniture in each of their houses belonged to each of them; and that they each delivered in, as stock, an equal sum to be employed in the said partnership business.

That it was mutually agreed between them that neither of them should or would follow the said business or any other business, during the continuance of the partnership, for their private benefit or advantage.

That the said partnership has, as the complainant believes,

continued to this time, and still continues. That the complainant and defendant during the said partnership were seized and possessed, as such partners, of the following real estate (describing the tracts) in the county of Atlantic ; being certain tracts formerly the property of Richard Price, containing about 3,932 acres, and which were conveyed by the Sheriff of Gloucester to Abner Doughty, Jr., by deed dated March 30, 1811, and by him conveyed to Daniel Doughty, by deed dated April 6, 1811, and by the said Daniel Doughty and his wife, by two deeds, one dated March 8, 1825, and the other October 18, 1832, were conveyed to the complainant and defendant ; also 100 acres, being part of a survey of 900 acres made to John Tilton, recorded &c., which they became seized of by virtue of two deeds, one from Abner Doughty, Jr. to the said Daniel Doughty, Enoch Doughty and the complainant, dated February 27, 1819, and the other from Daniel Doughty and his wife, dated October 18, 1832, to the complainant and defendant; also 788 1-2 acres, which the complainant and defendant became seized of by virtue, &c. ; also 100 acres, the half of which the complainant became seized of by deed from the defendant, dated March 8, 1825 ; also three fourth parts of a tract called the Cooper tract, which the complainant and defendant and Daniel Doughty and Parker Cordery purchased of Richard M. Cooper and others, by deed dated February 5, 1827 ; also a right and interest in a certain re-survey of 3,836 acres, made for Samuel Richards on behalf of the heirs of Joseph Ball, deceased, Daniel Doughty, Parker Cordery, Enoch Doughty and the complainant, as appears, &c., also a right and interest which the said Enoch and the complainant should or might derive from a conveyance that might be made by the administrators of Joseph Ball, deceased, in pursuance of an act of the Legislature, passed December 20, 1824, &c. ; also two equal third parts of a survey formerly made to Amos Ireland, deceased, containing 15 acres ; also the one-tenth part of a survey made to Abner Doughty, Jr., on the 8th of Feb. 1811, for 1,567 acres, which &c. ; also a survey (describing it) containing 25 18–100 acres ; also a survey (describing it) containing 8 61–100 acres ; also a tract of 210 acres, being part of a survey of 900 acres, made &c. ; also several tracts of land purchased

by the complainant and defendant of Benjamin Wilkins, former
Sheriff of Gloucester, as appears &c.; to wit: the saw-mill
called Clark's mill, with all the tracts adjoining said mill, with
all the buildings and improvements thereon; a tract called the
Monroe tract, of —— acres; a lot of 30 acres, which Thomas
Clark bought of Jonas Morse; a lot of 5 acres, lying &c.; three
surveys, containing 101 55–100, adjoining &c.; a tract bought
by Parker Clark of Benjamin Clark, by deed dated &c.; a tract
purchased of Henry Davis, by deed &c.; the half of 50 acres of
meadow on Nacot Creek, purchased &c.; the other half of said 50
acres, purchased &c.; a tract of 53 acres adjoining &c.; a lot
at Port Republic, containing 37–100 of an acre.

That the complainant and defendant were during said partner-
ship seized and possessed of considerable other real estate; and
also of various personal property; but that the complainant,
not having possession of the title papers, nor of the partnership
books, cannot set forth the same; but prays that the defendant
may set forth the same.

That, about the 1st of June, 1832, the complainant was taken
sick, and continued so for a considerable time; and he is informed
and believes, that during the latter part of June, 1833, and the
month of July following, he was deprived of his right reason,
and was of unsound mind and totally incapable of transacting
any business or of the government of himself and management
of his affairs; and he is informed and believes, that he continued
in such condition for some time and up to January 1, 1834; and
he charges, that while he was so afflicted and laboring under
such unsoundness of mind, the defendant possessed himself of
all the title papers of the partnership property and of the part-
nership books; and that he has refused to permit the complain-
ant to inspect the same, and refused to render any account of the
partnership property.

That on the complainant's recovery from his said sickness and
restoration to his reason and understanding, he found to his sur-
prise that the defendant had taken possession of all the partner-
ship property of a personal nature, a portion of which the com-
plainant can now recollect, consisting of one-third of the schooner
Sun, five-sixths of the schooner J. R. Rapley, one-third of the

schooner Uriah, one-third of the schooner Harriet, one-sixth of the said schooner Uriah, six mules, four horses, one four horse wagon, three two-horse wagons, one sulkey, 1,000 cords of pine wood ready for market, on a landing, 1600 cords of wood in the woods, ready to be made into charcoal; also a quantity of sawed lumber, ship plank, and flitch stuff of the said saw-mill, and about 1500 bushels of charcoal ready for market.

That on the complainant's making application to the defendant, the defendant to his great surprise informed him that he had, on the 4th of July, 1833, not only executed a bill of sale of all his right to the said personal property, but also a deed for all his right in the said real estate. That he then stated to the defendant that he had no knowledge of executing any such bill of sale or deed; and that, if such was the case, he the defendant well knew that the complainant had never received any consideration therefor, and that both were fraudulent; and the defendant then acknowledged that the complainant had received no value for the said property, and promised, or gave the complainant to understand, that he would re-convey to the complainant the said personal property as well as the said real estate; that, the defendant being a brother of the complainant, and the complainant placing reliance in his declarations, he suffered it to remain; believing that the defendant would fulfil his said promise, and would not undertake to strip him of his property; the wives of the complainant and defendant being also sisters.

The bill charges, that while the complainant was sick and incompetent as aforesaid, and the defendant was endeavoring to get the said bill of sale and deed executed, the complainant's wife opposed the execution thereof; that the defendant informed complainant's wife that he was satisfied the complainant could not live, and that, as the complainant had no children, he thought that he, the defendant, and his children should have the property of the complainant, as they by their exertions had made it, and as the complainant was incompetent to make a will, and that, should he die in such condition, the children of Daniel Doughty, another brother, would get a portion of the complainant's property. That the complainant's wife still resisted the execution of any writings by the complainant, and the defendant got

the complainant away from his home and procured the execution of the said bill of sale and deed, which deed was not executed by the wife of the complainant, and that the complainant has no knowledge or recollection of signing any papers during the said months of June or July 1833, nor of any thing that transpired during the said months, or long before or long after the said time.

That he has never received any consideration money from the defendant for the said personal property or the said real estate ; and that, notwithstanding the said deed, the defendant and complainant continued to cut upon the said property, and use and occupy the same, after the same manner as had been done previous to June 1833, up to July 1844.

That in or about July, 1844, the defendant ordered the sawyer at the saw-mill of the complainant and defendant not to saw any logs the complainant should have brought to the said mill, and took the exclusive possession thereof, and forbid the complainant and his workmen from cutting upon or using any of the aforementioned premises, and threatened to prosecute the complainant and his workmen for the same.

That the defendant caused a suit to be instituted in the Circuit Court of Atlantic county, against the complainant, in September, 1845, for $2,000 damages, for timber and sawing of lumber cut upon said premises and sawed at said mill. That up to this period the complainant always believed that the defendant never intended to enforce the said bill of sale or deed.

That no settlement of the partnership accounts has ever been made ; and that the defendant has collected in the partnership debts and applied the same to his own use, which he is enabled to do by reason of his possession of the books of the partnership.

That the defendant is now engaged, with a number of hands, on a part of the said property, cutting wood for coaling and logs to be sawed into lumber ; and that the complainant is informed and believes that no account is kept by the defendant of the amount of wood cut or the quantity of lumber sawed ; that it is hurried off to market, &c.

The bill prays an account of the partnership dealings and transactions from the commencement of the partnership, and of

the moneys received and paid by the complainant and defendant in relation thereto, and that the said deed and bill of sale may be set aside as fraudulent and void, or the defendant be decreed to re-convey to the complainant; and that, in the mean time, the defendant may be injoined from collecting or receiving any of the partnership debts, and that a *receiver may be appointed*; and that the defendant may be injoined from further prosecuting his said action at law, and from cutting or working upon the said premises or the said saw mill.

On the filing of this bill, an order was made directing the complainant to give notice of a motion for an injunction.

On the hearing of the motion the answer of the defendant was read.

The answer, after stating the nature of the partnership, says, that the partnership continued until July 2, 1833, when it was dissolved by mutual consent as afterwards in the answer particularly set forth.

It states the manner in which the partnership business was done; that in regard to each other each partner conducted their partnership business in a loose and general way; each seeming to confide in the other that at a proper time a just settlement would be made, and each bear a share of the losses and take a share of the profits according to his care and labor and the amount he had from time to time invested in the business of the firm.

That for two years and eight months during the partnership, commencing in February, 1824, he was Sheriff of Gloucester; that he still gave his whole time and attention, when not engaged in the duties of his office, to the partnership business; that the proceeds of his said office, amounting, to the best of his knowledge and belief, to more than $7,000, were used and invested in the partnership business, and went to increase the joint property and profits.

That prior to July, 1833, the complainant had at different times mentioned to him that he would like, before a great while, to dissolve their partnership and divide the partnership property equitably between them; that he, the defendant, always answer-

·ed in such case that he was at any time ready to dissolve whenever the complainant desired it; and that he would at any time join him in examining into the state of the partnership business, accounts and property, for the purpose of making a dissolution and equitable division of the joint property.

That after the complainant had thus mentioned to him at different times the subject of dissolving the partnership and dividing the property, the complainant, on or about July 2, 1833, made to him a distinct proposition for such dissolution and division, and the same was considered and debated between them at length; the terms proposed by the complainant were, without much if any alteration or modification, agreed upon between them. That it was then agreed between them that the partnership should be dissolved, and that a part of the real estate should be taken by the complainant and a part by the defendant; that certain parcels of real estate should not be then divided, but continue to be held by them as tenants in common; that the defendant should convey to the complainant all the defendant's right and interest in the real estate so to be taken by the complainant, and the complainant should in like manner convey to the defendant all the complainant's interest in the real estate to be taken by the defendant; and that the consideration to be expressed in each deed should be $2,000. That the defendant should lease and convey to the complainant the right to cut wood and timber for his use on certain lands in the answer after specified; that the complainant should take, as his own separate property, certain personal estate in the answer after mentioned; and that the residue of the joint personal property should belong to this defendant; that this defendant should have all the debts coming to the firm on book accounts or notes, and should pay all the debts against the complainant and defendant in Egg Harbor or Galloway, or in New York or Philadelphia; which, as he avers, comprised all or the chief part of the debts of the firm.

That in pursuance of said agreement and understanding he did, on the 4th of July, 1833, by deed by him executed and delivered to the complainant, dated July 2, 1833, convey to the complainant all this defendant's interest in certain tracts or parcels of land belonging to the firm, which were the same tracts

15

which the complainant had himself selected and chosen for that purpose; by means whereof the complainant became the sole owner in fee thereof, and took them to his own use, and hath ever since held and enjoyed the same; that this defendant has not the said deed, nor any copy thereof, and cannot therefore here set forth a particular description of the lands conveyed thereby.

That at the same time at which he executed and delivered to the complainant the deed first mentioned, to wit, on the 4th of July, 1833, the complainant, in pursuance of their said agreement for dissolution and division, did, by deed, by the complainant then executed and delivered to this defendant, dated the said 2d of July, 1833, convey to this defendant all the complainant's interest in certain tracts of land and real estate in said deed described, being the tracts of land particularly set forth in the complainant's bill of complaint; that the said deed was, on the same 4th of July, 1833, acknowledged before Daniel Lake, Esq., a commissioner &c., and was, on the 2d of August, 1833, recorded in the Clerk's office of Gloucester.

That at the time of the execution and delivery of the last mentioned deed the complainant had not any right or title to one of the tracts therein mentioned, to wit, the tract in the said deed mentioned as land which might or should be conveyed by the administrators of Jos. Ball, deceased, by virtue of an act of the Legislature passed Dec. 20, 1824.

The answer makes certain allegations as to this tract.

That the other tracts mentioned in the deed from the complainant to him were a part of the partnership property, and that by virtue of the said deed he became the owner in fee of all the complainant's interest therein, and thenceforth held the same as sole owner thereof.

That the consideration money mentioned in each of the said deeds, the one from the complainant to him, and the other from him to the complainant, was $2,000; but that no consideration was paid by either to the other; the sole consideration being the mutual and simultaneous execution and delivery of the said deeds, and the desire and purpose of making a fair and just division of the partnership property.

That, in further carrying out their said agreement for dissolution and division, the complainant, on the 4th of July, 1833, by bills of sale under his hand and seal duly made and executed, conveyed to him five-twelfths of the schooner J. R. Rapelye, one twelfth of the schooner Uriah, and one third of the schooner Sun.

That, for the purpose of making the sale and transfer of the said shares in the said vessels and making enrolment thereof, it was necessary for them to go to the office of the Collector for that District; and that they accordingly called on Doctor Mahlon D. Canfield, then Collector, and informed him of their wishes; and at the request of the complainant and this defendant, the said Canfield drew the said bills of sale, and the same were executed in his presence and signed by him as a subscribing witness; that the shares of the said vessels so conveyed were estimated between the complainant and this defendant, and the estimated value was put into the said bills of sale as the consideration thereof, which was either paid by this defendant to the complainant or allowed and satisfied to him in the settlement and division of their partnership business and property.

That after the said deeds for the said lands and the said bills of sale for the said shares in the said vessels were delivered, and on the 6th of July, 1833, according to the best of this defendant's recollection, the complainant himself drew up and prepared an agreement in writing for the dissolution of the said partnership, and for a further division of certain partnership property and a settlement of the partnership accounts and debts, to be signed and executed by him and this defendant. That a copy of the same was then made by this defendant's son, John H. Doughty, and was, on the said 6th of July, signed by the complainant and this defendant, under their hands and seals; but bore date, nevertheless, on the said 2d of July, on which day, as before stated, the proposition for a dissolution and division of the partnership property was made and agreed to.

That this last agreement, so made and executed, is as follows: " To all to whom these presents may come : It is agreed between Enoch Doughty and Nathaniel Doughty, both of &c., have this 2d day of July, A.D. 1833, dissolved all business existing be-

tween us by mutual consent; and the said Enoch Doughty is to have all the debts coming to them on book account or on notes of hand, and the said Enoch Doughty is to pay all the debts that is against the said Enoch Doughty and Nathaniel Doughty in Egg Harbor or Galloway townships, Philadelphia or New York, so that the said Nathaniel Doughty has nothing to pay for any labor that has been done previous to this day, and he is to have two hundred cords of pine market wood on Absecom Landing which the said Nathaniel Doughty shall choose, also the two grey horses and gearing, a two-horse wagon, the chair and harness and the old sorrel horse; as witness our hands and seals the day and year first above written." The defendant says there were two copies of said agreement executed at that time, and one was taken by each of them. And he believes and charges, that the complainant, when he prepared and filed his bill, had, and that he still has a copy in his custody or under his control; yet he has not set the same forth in his bill, nor made known to the court the existence of such instrument, and has therein shown himself unwilling to set before the court the whole facts and truth of the case.

That, in further carrying out their said agreement for division of property and dissolution of partnership, he and the complainant did, on or about the said 6th of July, make and execute a certain other agreement in writing, under their hands and seals, which, nevertheless, also bears date the said 2d of July; and that by that agreement this defendant leased certain real estate therein mentioned to the complainant, with the right to cut wood thereon, and made further stipulations with the complainant respecting certain other of the personal estate of the said partnership to be taken and held by the complainant for his own use; which agreement is as follows, to wit: " To all to whom these presents may come : I, Enoch Doughty, of &c., of the one part, doth agree to release unto Nathaniel Doughty, of &c., of the other part, the whole of the cleared land except where the Surveyor's house stands, on the south side of the mill, and all the privileges of cutting market wood, that is to say, between the Branch and the Absecom road, from the field down to William Chamberlain's line near where the May's landing road puts off,

that is to say, on the south side of the main branch and on the north side of the road, for five years from the date, or as long as he may want it himself or his wife Sarah Doughty ; and Nathaniel Doughty is to have the cedar for his own use, and also oak timber for firewood, and to have what lumber he wants for his buildings that is already sawed ; and said Nathaniel Doughty is to have his equal half part of all the carpenter's tools, vessel screws, plows, harrows, shovels, forks &c., blocks and rigging, and half part of the salt they have now on hand, together with the half part of all the stock of store goods now in possession, and the iron that is at James Smith's, Absecom, and also at home ; as witness &c." That the said agreement was prepared under the direction of the complainant, and is in part in the complainant's own hand-writing, and that a duplicate thereof was also executed, and then and there given to the complainant.

That, immediately after the execution of the two last mentioned articles, the said Nathaniel delivered over to him sundry deeds, papers and writings relating to the property which they had held as partners, and also the before mentioned account book which had been kept at the store of the firm, as before stated ; and that the complainant retained certain other partnership papers for himself ; that this defendant then intending to keep said account book as his own thereafter, as it was intended by the complainant that he should, immediately wrote therein as follows : " Enoch Doughty began to keep the account in this book alone, Doughty's mills, July the 6th, 1833." That from that time forward he conducted his business separately and on his own individual account, and made his entries in said book, and kept the same accordingly.

That when he and the complainant made their aforesaid agreement for a dissolution and for a division of their partnership property, and when they executed the said deeds, bills of sale, agreements and writings for the purpose of carrying out their agreement for such dissolution and division, the complainant was of sound mind and understanding and in full possession of his reason, and was in all respects capable of managing his estate and property and of making contracts of any nature whatever in relation thereto.

That the defendant fully believes, and so he charges the truth to be, that the said agreements, deeds, bills of sale and contracts between this defendant and the complainant for the dissolution of their partnership and the division of their partnership estate and effects were made and executed by the complainant while in full possession of all his mental faculties, and with a complete knowledge on his part of the nature and effect thereof, and that all the allegations of the complainant's bill to the contrary are, as this defendant believes, wholly untrue.

That he has no recollection that the complainant was taken sick in the latter part of June, 1832, as in the bill is mentioned; and he never knew or heard that in the latter part of June, and in the month of July, 1833, the complainant was deprived of his right reason or was of unsound mind and incapable of the government of himself and management of his affairs, as is stated in the bill; and he does not believe that the complainant was in such a state of unsoundness of mind, or that he was deprived of his reason or incapable of the government of himself or management of his estate; and he wholly denies that such was the case; and charges that such allegations are made in the bill without foundation in truth, and for the purpose of avoiding his contracts made by him in a deliberate manner and with a full understanding of their nature and effect.

He says, that at the time the partnership was dissolved the complainant had full knowledge of how their business stood and of the partnership property, debts, dues and liabilities; and, possessing such knowledge, he made to this defendant, as before stated, a proposal to dissolve partnership and to divide their property in the manner before stated, and the same was accordingly done. He therefore conceives that, as the complainant neither made nor sought nor desired a statement of the partnership accounts before the dissolution, nor at the time thereof, and having agreed to and made a dissolution and a division of estate, he cannot now complain that he never saw any statement of accounts or that this defendant has never made any.

He says he has repeatedly and at different times requested the complainant to account to and settle with him for various matters and transactions had and done between them since the said

dissolution; but the defendant has always refused to do so; and, in order to compel a settlement, this defendant was at length, and after the lapse of several years, compelled to commence a suit, and did sue the complainant at law; which suit is still pending.

He says it is not true that the complainant ever stated to him that he, the complainant, had no knowledge of executing the said deed and bills of sale, or that he the complainant had never received any consideration for the same, or that they were fraudulent; nor did this defendant ever acknowledge or say to the complainant, or to any other person, that the complainant had received no value for the said property so conveyed by him; nor did this defendant ever promise the complainant or any other person, or give him or them to understand, that he would reconvey to the complainant the said personal and real estate so conveyed by the complainant, as is alleged in the bill. On the contrary, he believes and charges the truth to be, that the complainant executed the said deeds and bills of sale with a full knowledge and understanding of their nature and contents, and that he received from this defendant a good and valid consideration therefor, and such as was agreed upon between them, and was at the time perfectly satisfactory to the complainant, and was, in truth, of his own proposing, being the matters hereinbefore set forth.

He denies that he informed the complainant's wife at any time that he was satisfied that the complainant could not live, and as he had no children this defendant thought that he and his children should have the property of the complainant, or that as the complainant was incompetent to make a will, should he die in that condition the children of their brother Daniel would get a portion of the property to which they were not entitled.

He says that the wife of the complainant never did, to the best of his recollection and belief, object to or oppose her husband's signing and executing said deed or the said bills of sale.

He says it is not true that he got the complainant away from his home and procured the execution of said deed and said bill of sale. On the contrary, he says and charges, that the terms of dissolution and division of partnership property before mentioned were talked about and discussed at different times and places,

and in part at the complainant's own house and in the presence of complainant's wife and without objection on her part. That it was finally agreed that the said deeds and bills of sale should be executed, and that the wives of the complainant and this defendant, respectively, should join their husbands in the execution of the deeds for the conveyance of real estate to be executed by them and hereinbefore mentioned ; that it was agreed that the deeds should be prepared by this defendant's son, John H. Doughty, under the direction of the complainant and this defendant, and that then the complainant and this defendant, with their wives, should execute and acknowledge them before Daniel Lake, a commissioner &c., who resided about four miles from the complainant's house. And as the complainant and defendant, in order to complete the transfer of the shares in the said vessels, must go to the house of the said Doctor Canfield, Collector as aforesaid, it was thought best to do all the said business at one time, as the said Collector lived a little beyond the said Daniel Lake, and on the same road ; that in pursuance of the said understanding the said deeds were drawn and the names of the wives were inserted therein ; that, at the time agreed upon, the 4th of July aforesaid, this defendant and his wife went to the house of the complainant, as the complainant had himself requested ; that at the house of the complainant, on that day, the said deeds were examined and read by the complainant and his wife, and they prepared to go with this defendant and his wife to execute and acknowledge them as aforesaid ; but, as they were about starting, some friends came in as visitors to the complainant's house, and it was then agreed that the complainant and defendant should go alone and execute said deeds, and that their wives should remain with their visiters, and execute the deeds at another day ; that accordingly the complainant and this defendant went first to the house of the said Doctor Canfield, who drew the bills of sale, and they were then executed by the complainant in the presence of the said Canfield, who signed the same as a subscribing witness.

That the complainant and this defendant, also, at the same time, executed the aforesaid deeds, and the said Canfield also signed them as a subscribing witness ; that afterwards, on their

return home, on the same day, they stopped at the house of Daniel Lake, and there, before him, acknowledged the said deeds ; that afterwards, the wife of the complainant and the wife of this defendant, who are sisters, agreed together, as this defendant has been informed and believes, that neither of them would sign the said deeds ; and as neither the complainant nor this defendant deemed it a matter of great moment, or one likely to create difficulty, nothing farther was said about it.

That the said two articles before mentioned, to wit, the article of dissolution and the article by which this defendant leased certain land to the complainant and assigned certain of the personal property of the partnership to him, were both executed at the defendant's own house, and in the presence of the complainant's wife and other persons ; that the complainant himself drew or assisted to frame the said articles ; and Chas. C. Murphy, one of the subscribing witnesses to the said articles, is a nephew of the complainant, and then lived in his family ; that the complainant's wife did not then, or at any other time, raise any objection to the execution of the said instruments ; yet they were read and executed in her hearing and presence.

He says it is not true that notwithstanding the said deed the complainant and the defendant continued to cut upon the said property and use and occupy the same after the same manner as had been done previous to June, 1833, up to July, 1844. On the contrary, he says that immediately after the delivery to him by the complainant of the said deed dated July 2d, 1833, and conveying to this defendant to his own use in fee simple all the complainant's right in the several parcels of land therein described, he, the defendant, took the same into his possession as his own separate property, and has ever since held and used the same as his own ; that neither the complainant nor any other person has cut thereon or used the same, unless by this defendant's consent, without being held by him as trespassers.

He says the complainant has, at different times since the delivery of said deed to him, cut wood on said lands, but only by permission of this defendant, and in such manner and at such times and places as this defendant permitted, or if he has cut without such permission it has only been as a trespasser. That

for the wood and timber so cut he has always expected the complainant would pay him, the same as other persons did. And this defendant repeatedly applied to the complainant to account with·him for the wood and timber so cut, and to pay him for the same, and to settle their accounts in regard to other business transactions between them; and the *defendant* (meaning the complainant) never alleged to this defendant that he had right to such land as part owner thereof until about the time this defendant sued him at law to obtain a settlement of the accounts standing between them.

That the complainant has, also, since the said dissolution of partnership, had considerable lumber sawed at this defendant's mill, and has had sundry other dealings with this defendant, by means whereof he has become largely indebted to this defendant. That he has also dealt considerably with the firm of E. Doughty & Son, composed of this defendant and his said son John, at their store and in other ways, and is now indebted to them in a considerable sum ; that, the complainant having been repeatedly requested to come to an account and settlement of said accounts with this defendant and with E. Doughty & Son, and to pay up what was in arrear and due to them, and having always refused or neglected so to do, this defendant and the said firm were at length compelled to resort to compulsory measures. That, accordingly, this defendant directed his sawyer at his saw mill to saw no more lumber for the complainant without orders from this defendant, and forbid the complainant and his workmen from cutting on said lands; and this defendant and the said E. Doughty & Son each commenced an action in the Circuit Court of Atlantic against the complainant, to recover from him the sums so as aforesaid due from him to said plaintiffs, and which he always neglected and refused to account for and pay.

He says that, immediately after the said dissolution of partnership and after the manner of dividing the partnership property had been settled and agreed on, and the said deeds, bills of sale and articles had been executed, the complainant took into his possession, as his own separate individual property and for his own use, all the personal property which had been assigned to him in such division ; that the complainant also took posses-

sion of, and kept and used as his own, all the tracts or parcels of land and real estate which, according to the division of the partnership property so as aforesaid agreed on, had been set off to him as his share, and in and to which this defendant had relinquished and conveyed all his right, share and interest to the complainant by the aforesaid deed executed and delivered as aforesaid to the complainant by this defendant, and dated on the 2d of July aforesaid; that the complainant has ever since held and enjoyed the said lands as his own and to and for his own separate use and benefit; that the complainant has also cut and used all the wood and timber on the lands leased to him by this defendant and mentioned in said lease or agreement of said July 2d; that within a few years past, defendant thinks about five or six years ago, the complainant sold and conveyed to Gilbert Miller a part of said lands so released and conveyed to him; that Miller has taken possession of the part so sold to him and fenced it, and has erected a dwelling house thereon, which is now occupied by said Miller's tenant; that, ever since the dissolution of said partnership and the division of said property, the complainant has also carried on his own business separate and apart from this defendant, and has dealt on his own account and for his own benefit; and that this defendant has, ever since said &c., held, possessed and enjoyed as his own separate property all the estate, real and personal, assigned to him in said division; that this defendant possessed, used and occupied the said real estate according to the nature thereof, part being land used for agricultural purposes, and part being woodland.

That he has always paid all taxes and assessments thereon, and defended the same against trespassers; that, the title to a part of the same having been in dispute before and at the time of said dissolution, he was afterwards compelled to assert and defend the same by suits or by arbitration; and he did so at his own proper costs and charges, and bore the labor and care of such proceedings; that a part of the said real estate was a tract of land with a saw mill thereon, which mill this defendant from time to time repaired; and finally, deeming it his interest to do so, he took said mill down to its foundations and erected it anew, and made it for a single saw, whereas it was before for two saws; that he also al-

tered the dam by cutting it and building flood-gates in it ; all which he did at his own proper costs and charges, and of his own mere motion, without consulting or advising with the complainant or any one else ; and the complainant, though living near, and seeing and knowing what this defendant was doing, did not in any way interfere or make any objection, or advance any claim or pretence of right; that this defendant rebuilt said mill and made said alterations in the dam in 1841 ; that this defendant, also, some time in 1836, sold and conveyed about 100 acres of the land so relinquished and conveyed to him by the complainant as part of the partnership property by the deed hereinbefore mentioned.

That in dissolving said partnership the complainant took upon himself no burden or risk; that the real estate assigned, and which he has held as his own under the said deed from this defendant, was clear of all incumbrance ; that the complainant had no partnership debts to pay nor partnership dues to settle and collect.

He says he has taken no more of the personal property than was apportioned and assigned to him in and by said dissolution ; and has taken and held and now holds only so much of the real estate as in said division and dissolution was assigned and apportioned to him ; that he has paid the partnership debts, and has collected moneys due the partnership on notes or book account, and all that are of any importance or can be collected, so far as he knows ; but the amount thereof he is unable to state.

He then states how he is using the real estate and the wood and timber thereon ; that he is cutting it for market, and is committing no waste ; but that his course in the use of the said lands, and in cutting wood and timber thereon, is the same now as it always has been heretofore. He denies that the wood is hurried off to market, or that there is anything unusual in the places or manner of chopping ; and he denies all desire or intention to commit waste. He says he is fully able and willing to pay the complainant all moneys, if any, to which the complainant may be found entitled upon a just account and settlement between them ; and that he is willing at any time to come to

such account, and has frequently sought it from the complainant, but without success.

He says that the suit commenced by him in the Atlantic Circuit is for causes of action which have arisen since the said dissolution of their partnership, and is in no respect for any of their partnership business or transactions, or for any causes of action arising thereon; and he believes and charges that upon a just settlement of their accounts the complainant will be found largely indebted to him.

The motion for an injunction was argued at the term of December, 1846.

*Mr. Jeffers* in support of the motion.

*P. D. Vroom* contra. He cited *Dickens,* 667; 3 *Br. Ch.* 621; 2 *John. Ch.* 122; *Eden on Inj.* 221; 2 *Ves. & Beam,* 329; 15 *Ves.* 10; *Gow on Partnership,* 128, 9; 2 *Anstruther,* 453; 2 *Merrivale,* 405; 1 *Sim. & Stuart,* 130; 2 *Mad. Ch. Pr.* 191, 2.

THE CHANCELLOR. The case made by this bill, unaffected by the answer, would present so strong a case of fraud that the court would be disposed to deal vigorously with it, and to grant an injunction to the extent prayed. But the answer of the defendant, though not satisfactory, is perhaps sufficient to put the main charge of the bill, the mental incapacity of the complainant at the time of the alleged dissolution of the partnership, in doubt. It is a case in which the complainant's title is disputed. And if, in view of the answer, the complainant's case was more clear, the result would only be, that for the present the partnership would be considered as continuing; and in that view of the case, considering the nature of the property, and that the defendant, as is shown by the answer, is only cutting for market, in the same way in which it was done when the partnership confessedly existed, and that no charge is made in the bill of inability in the defendant to respond, and his ability being expressly shown by the answer; it appears to me it would be going too far to break up the

business entirely, by restraining the defendant from cutting.

As to the prayer for an injunction against the defendant's further prosecution of his suit at law, I think it should be granted. The bill charges that, notwithstanding the deeds of dissolution, they both, after the complainant's recovery, went on cutting and hauling to the mill as before ; and that the suit is for timber and sawing lumber. The answer admits that the complainant has at different times since the dissolution cut on said lands, but says it was only by permission of the defendant, or, if he has cut without such permission, it has only been as a trespasser ; that he, the defendant, has repeatedly requested the complainant to account and settle with him for various transactions had between them since said dissolution ; and that, in order to compel a settlement, the defendant was at length, and after the lapse of several years, compelled to commence a suit. And at another place the answer says, that the complainant has since said dissolution also had considerable lumber sawed at the mill and has had sundry other dealings with the defendant, by means whereof he has become largely indebted to him ; that the complainant having been frequently requested to come to a settlement of said accounts, and having always refused and neglected, the defendant at length directed the sawyer at the mill to saw no more lumber for the complainant, and forbid the complainant and his workmen from cutting on said lands, and sued the complainant to recover said sums. These parts of the answer are sufficient to apprize the court that the suit is for matters connected with the subject of controversy here ; and they at the same time furnish something of corroboration to the statements of the bill. It is evident the suit at law brought by the defendant is founded on the assumption of the validity of the deeds of dissolution and division, the matter in controversy in this court.

An injunction will be allowed restraining the defendant from the further prosecution of his said suit at law.

The cause proceeded ; and was brought to hearing, on the pleadings and proofs, at the term of June, 1848.

The testimony taken on both sides is very voluminous. The following abstract gives the substance of it :

### TESTIMONY FOR THE COMPLAINANT.

*Mrs. Ann Murphy*, for the complainant. She is a sister of the wives of complainant and defendant. She went to live in complainant's family in 1828, and lived there till Sept. 1834; complainant was sick several times while she lived there. Recollects that he was very poorly in the spring and summer of 1833. During that time he at times was not capable of doing any business, in her opinion; he was at that time under the Doctor's hands at intervals. Defendant was frequently at complainant's house during his sickness; defendant came there to get complainant to go down shore to sign the deeds; she expects to defendant's; she knows nothing about the deeds. This was in July, 1833; complainant was in the room, on the bed, lying down, when defendant came. At that time she did not consider complainant fit to do any business. At that time complainant's wife did object very highly to complainant's signing any papers. She has no recollection of seeing defendant's wife that day. Complainant's wife followed defendant into the room where complainant was. The company came about the time they came out of the room. The company were Sherman Clark and his wife and Susannah Clark. On that occasion did not see defendant's wife there. Witness was there all day. Did not hear complainant's wife say she was going away that day. Saw complainant go out of the yard with defendant that day; defendant brought complainant back in a wagon, towards night; it was after dinner when they started. Complainant was poorly all that summer. Complainant has no children. Defendant had five children; his son John was born in Nov. 1816; John was off at school before 1833, and defendant's daughter Rebecca was at boarding school in 1833. In August, 1833, she went with complainant to Mark Basset's; complainant's wife was not well enough, and witness had to go with him. On our return we came by Daniel Lake's; complainant called for the deeds, and Mr. Lake told him that defendant had taken them away. Mr. Lake is dead. Complainant, during the sickness I have spoken of, was attacked with fits; witness saw him have one some time in the spring. The reason she went with complainant was that his wife did not like to trust him to go alone, as she did not think him fit to be trusted alone.

Recollects that defendant and his son John were at complainant's house in Aug. 1833, while complainant and his wife were gone to camp meeting. They were overhauling books which were in the desk. Does not know that any books were taken from the house.

*Cross-examined.* It was on the 4th of July, 1833, that defendant came to complainant's and took him to sign the deeds ; there were no papers read in her presence that day. Defendant generally went with complainant to Absecum, when complainant was able to go. Complainant built a house on the Peggy Leeds' place; thinks it was in the spring before witness moved away from there. He was at work at it then.

*In chief.* After July, 1833, recollects Daniel Lake's coming to complainant's to get his wife to sign a deed. She refused. Witness heard no deeds read on that occasion. On the 4th of July, 1833, she did not consider Nathaniel capable of transacting such business as executing a deed. To witness's knowledge complainant's wife was always dissatisfied with complainant's executing a deed to defendant, and so expressed herself. In witness's opinion, complainant did not seem to know the importance of what he was doing in executing the deed to defendant. During the spring and summer of 1833, complainant's wife and witness had to be up considerably with him at night; he was queer at nights, as well as days ; he would not let any body sleep. A good while after that, the wife of defendant sat up with complainant, with witness. She has heard complainant call on defendant, since July 4, 1833, to give him up his deeds, and say to defendant he had taken advantage of him. Thinks she has heard it more than once. Has often heard complainant's wife say to defendant that he had taken the advantage of them in the execution of the deed. Defendant and complainant's wife used to quarrel every time defendant came over there, for a long time.

*Cross-examined.* Complainant had John Colyer and Charles Murphy hired before and after July, 1833. Complainant had

cord wood cut after that time, she guesses, and she expects they carted it to the landing. After that time, complainant's team used to cart logs. She can't recollect any particular time in the spring and summer of 1833 when complainant was confined to his bed. He was up and down ; he was very queer during that time ; he used to sit about and lay about. Complainant has had workmen employed in making repairs about his house since July, 1833; and has built additions to his house since then. She has seen complainant's team carting wood by where she now lives, since 1833, every year, through the working part of the season; not every day, but now and then ; complainant sometimes carts, himself. He has built a small house on the road from Absecum to May's landing since witness left living with him.

*John Collyer*, for complainant. Is 61 or 62 years old. Has lived in complainant's family above 14 years ; lived there in the years 1832, 3 and 4. Complainant was sick in 1833 ; he was also sick in 1832. Defendant used to be there, off and on, during complainant's sickness ; should say complainant had not, during the spring and summer of 1833, his proper senses at times. Witness sometimes followed him when he went from home. When he followed him he did not consider him capable of taking care of himself. Witness had known him well before that time ; he was a smart man at one day. Witness had gone with him by water before that time ; he appeared to be stupid and dumb during the spring and summer of 1833 ; he was confined to his bed at times. During that spring and summer witness did not consider him capable of doing any business. Recollects that defendant came to complainant's in the summer of 1833 to get him to go down shore to execute a deed. It was on the 4th of July, 1833 ; witness saw them go away together. On that day and at that time witness did not consider complainant capable of doing any business. Recollects on that occasion defendant's handing a paper to complainant's wife to look at. Witness believes she objected to complainant's signing any papers at that time. While complainant's wife was reading the paper defendant had handed her, defendant, without her handing it to him, took it out of her hand. If defendant's wife was there at that

16

time witness did not see her. He did not see her there that day that he recollects of. There was company came there about the time complainant and defendant went out. Saw complainant. when he came back; did not consider him better qualified to do business when he came back than he was when he went away. He went to bed sick when he came home; defendant brought him back in the same wagon they went in. During that spring and summer complainant frequently had fits. After the 4th of July, 1833, he recollects the complainant's going down to Daniel Lake's to get his deeds, and he appeared to get bewildered; witness tracked his sulkey wheels. He started to go to Daniel iel Lake's, the women said. Witness tracked the sulkey wheels round the old road by Ingersoll's branch, in the direction of Daniel Smith's. He turned off into a parcel of log roads, and then came home again. After he got home, Bill Pine took him down to Lake's ; Pine is not now living. Witness has heard complainant's wife call on defendant to give up the deed for the property or make satisfaction, or they would commence a suit against him, or some such talk as that, witness believes. Complainant's wife expressed a great dissatisfaction from the beginning about the conveyance from complainant to defendant for the property.

*Cross-examined.* He now lives with complainant, as a hired man. Complainant did not do any business of any account during the spring and summer of 1833. Once in a while he used to ride down to Absecum. Once he tried to run away to come down to Absecum. Complainant had spells of sickness several times previous to the spring of 1833. He was worse then than in 1833. He was confined to his bed the first time; the last time he ran about like a crazy man ; he could not run the first time.

The reason he says complainant was not capable of doing business on the 4th of July, 1833, was because he was half crazy that day, and had been half crazy for a month before. The reason I considered him crazy on that day was because he rolled up his eyes and stared up about the house ; and if you asked him any question he could not tell you what to do, and had been so for a month before. During said month complainant went to Abse-

com sometimes. It was a good while after the 4th of July, '33, before complainant commenced doing business; and is hardly capable now. Witness lived with him more than five years after July, 1833. When complainant and defendant got back on the 4th July, 1833, witness was in the field, and came to the house. When he got to the house he asked complainant's wife where complainant was. She said he was sick and gone to bed. Witness did not see him that night after he came home.

*In chief.* After July 4, 1833, complainant continued in that wild manner spoken of in witness's cross-examination for some time, and continued crazy in the manner therein spoken of. Witness had to watch him at nights; and he got away from witness one night. Witness got asleep, and complainant slipped out of the door. His wife called me, and I caught him back of the orchard, near the pond. Witness saw him on the 5th of July, '33; he was pretty much the same as on the 4th. During complainant's sickness, in 1833, witness used to see defendant there very frequently.

. The house on the Peggy Leeds' place was raised late in the fall of 1833.

During the time defendant was Sheriff, the complainant conducted the business at home, was the business man, and had the charge of the business generally, and had all the say. Complainant carried on the saw mill also at that time.

*Cross-examined.* It was in the fall of 1833 that the complainant repaired the old barn at his house. He moved the old barn across the road and repaired it. During the time defendant was Sheriff, complainant did the business principally about the place; I mean both farms. When defendant was at home he did his share of the business on the two places. They were as one man; what one did, the other did not object to.

It was in 1833 that complainant ran away from him in the night and he found him back of the orchard. Witness lived at complainant's while defendant was Sheriff; he worked on defendant's place as much as he did on complainant's.

*Jos. Hackney*, for the complainant. Is 39 years old; was at

work at complainant's, as a carpenter, in the months of June and July, 1833. Recollects complainant's having a very severe fit the last of June or first of July, 1833. Witness did not think him for a day or so after the fit, at any time during day, competent to do any business whatever. For days afterwards he had these fits, when he was not competent for the transaction of any business whatever. Some days he appeared to be right; and part of other days he did not appear to be right. Can't say how long after the complainant had had that fit in the last of June or first of July, 1833, he continued in that way.

*Cross-examined.* When complainant had the fit, witness was at work on the top of the wagon house. Can't state the day positively when complainant had that hard fit. Thinks complainant might have been walking about out doors the second day after he had the fit. Can't remember how long before he had the next fit. Can't say positively whether the fit spoken of was in the last of June or first of July.

*In chief.* Is satisfied that complainant had that hard fit either the last of June or first of July.

*Israel Hacket,* for complainant. Is 46 years old; has been acquainted with complainant 20 or 25 years; was at work at complainant's, with Jos. Hackney, in June and July, 1833, at the carpenter's business. Recollects that the complainant had a very severe fit the last of June or first of July, 1833. For a day or two after that fit, witness did not consider complainant competent to any business whatever, at any time during the day. For several days after I do not recollect whether the complainant was capable of doing any business. Witness thinks after that fit, some parts of days, complainant appeared to be right, and some parts of days he appeared to be not right. By not right, I mean that he was not in his proper senses. He continued some time in that way of not being in his proper senses after the fit he had the last of June or first of July; cannot tell how long.

*Cross-examined.* Can't recollect positively the day on which complainant had that fit.

*Hugh Lippincott,* for complainant. Is about 60 years old; has been acquainted with complainant and defendant very intimately for 23 years; has worked at the carpenter's trade, millwrighting, &c.; has lived at Absecom about 23 years. Complainant and defendant were in partnership when he went there, and witness thought they continued so, till he heard differently, quite lately. Witness sold them hay, and timber for building vessels. Recollects complainant's being sick during the spring and summer of 1833. Witness sat up with him. During that spring and summer complainant did not know what he was at. The night I sat up with him he was dreadfully out of his mind; he appeared to be all over the world. Witness was at work at complainant's in July, 1833. The 29th of July, 1833, he charged complainant and defendant, on his book, with work done for them on the barn at complainant's down by the saw-mill, about half way between the house of complainant and the house of defendant. Witness frequently saw complainant before the 29th of July; not a week but what he saw him. Before that day witness built there a cider mill during that year; it might have been before; it was built in the fall. Witness did not think complainant had his proper reason then; witness wanted good hard wood to build the cider mill, such as white oak, as he told complainant; and complainant went and got an old pine log. Witness told him it would not do. It was of no use; he would have his own way. Witness went to work and finished the mill out of the pine log. They hitched a horse to it and went to grinding apples, and before witness could get his tools packed they tore out one or two teeth; witness repaired it with harder wood, and after he had gone they tore out more teeth and tore it all to pieces; and no man in his senses would have had a mill built of such wood. It cost $12 or $15, and was not worth $1 when first done. Thinks he built this mill the fall before July, 1833. After that time witness cannot say whether complainant was capable of doing business or not up to July, 1833. He was always on the go, somewhere or other; sometimes down shore and sometimes at Absecom; but I don't know whether he did any business or not. During those rides down shore and at Absecom witness did not think complainant in his right mind; his

wife was always uneasy when complainant went away unless she or some of the family was with him. This was along before and after July, 1833. During his sickness in the spring and summer of 1833 he was up and down, out and about, and they could not keep him in the house. During this spring and summer he had a very wild look out of his eyes; he talked about very foolish things a good deal of the time in the conversations witness had with him. Witness did not know but what he had his proper senses when witness was at work at the barn he built for him in July, 1833. Recollects being at complt's when def't and compl't were there when there was considerable paper and silver money on the floor. Witness went into the kitchen and inquired for one of them. He was told they were in the parlor. Witness opened the door and went in. Complainant was lying on the floor and defendant sitting on the floor. As witness opened the door complainant rolled over on his money to hide it. When he discovered who it was he rolled back again off of it. Witness thought no one in his senses would have acted in that way. He cannot ascertain whether this transaction took place before or after July, 1833. When defendant was Sheriff he was very seldom at home. Complainant went in one of the vessels when witness first went to Absecom, as captain, and was a very smart man. He continued until he was taken sick. Witness was on the beach when he came in sick. They came for witness to sit up with him. Can't say what year this was. He has never had charge of a vessel since; don't think he has been capable of taking charge of a vessel since.

*Cross-examined.* Don't recollect which of them settled with me for the building of the barn, but think complainant paid most of the bill. Witness expected they were in partnership at the time. He built a saw-mill for defendant five years ago; he contracted with defendant for building it; he expected they were in partnership at the time; defendant settled with him and paid him off.

The next work he did after framing the barn at complainant's was framing a two-story house to go to the Peggy Leeds place, for complainant. He considered this work for complainant

alone, and so charged in his book. Complainant told him he had purchased the Peggy Leeds place himself, and it was his own property. Witness supposes there was no partnership about it. This was in the fall of 1833, after the barn was built.

*In chief.* When he commenced building the saw mill, five years ago, he supposed complainant and defendant were in partnership. Complainant was at the saw-mill when it was raised, and superintended the raising. The defendant was not there.

*Cross-examined.* John Doughty was there at the raising. Defendant was on the road from Philadelphia, or at Philadeldhia. Witness built the mill under the direction of the defendant ; he furnished the principal part of the timber ; he guesses the whole.

*John L. Erwin,* for complainant. Is 41 years old ; knows the parties ; has a recollection of complainant's being poorly and sickly in 1832 and '33 ; worked for complainant during that period. During the spring and summer of 1833 he considered complainant not competent to do business. Can't say that complainant did even any little business during that period. During that period, when witness wanted money, he always went to complainant's wife for it. He did so because he considered complainant incompetent to do business. Recollects hearing the family say that complainant had violent spasms. Recollects the Doctor's coming there frequently during the years 1832 and '33. During the spring and summer of 1833, complainant was up and down, out and about. When asked he would give no directions about his work, but told witness to do as he thought best. He did not seem to know how he wished his work done ; did not seem to say much about it ; did not seem to take any interest in his business at all. Witness speaks of the years 1832 and '33. Complainant used to be wandering about the place, but did not go from home much. His wife appeared to be very anxious about him when he did get away. During that time he appeared to be stupid. Some part of the time during these two years he appeared to be very sleepy ; at other times he appeared to be

very wild, and could not get to sleep. During the spring and summer of 1833, witness considered him wholly incompetent to take care of his person or property.

*Cross-examined.* He worked at carpenter work for complainant, off and on, during the years 1831, '32 and '33. He boarded at complainant's.

*In chief.* Witness went by water with the complainant long before 1831. Complainant never settled with him during the years 1832 and '33. Witness did not consider him competent to settle accounts during that period.

*Absalom Cordery,* for complainant. Is about 52 years old; has been acquainted with the parties 30 years; recollects complainant's having a spell of sickness in 1828 or '29. He was sick some few years after that; can't tell the year. Witness went up several times and sat up with him; it might have been in 1832 or '33, but he has nothing to fasten it on his recollection. In this spell of sickness last spoken of, he appeared to be very much deranged and out of his mind. Witness recollects sitting up with him on that occasion when he had difficulty in keeping him in the house; recollects his endeavoring to get out, thinking his vessel was ashore. We had to quiet his mind and endeavor to get him off from it. He had no vessel on shore at the time. In some of his moves towards going to get his vessel off, he got his shoes, which were new, and said they wanted mending, and got his ends and awls and sewed them about in places. We suffered him to do it in order to take up his time, in preference to his going out; and we would have to watch him. After he was sick he was debilitated; his health was poorly for some time; but there is no act that occurs to witness's mind as to the state of complainant's mind after that time. In 1828 he was very sick. In his last illness he was more deranged than sick.

*Cross-examined.* Can't recollect the year when complainant had the deranged spell of sickness. The last spell of sickness, he was not confined to his bed all the time.

*Mrs. Alice Clark*, for complainant. Is 47 years old; has been acquainted with the parties 25 or 30 years. Has a recollection of being at complainant's in the beginning of July, 1833; saw complainant then; he looked emaciated; witness spoke to him; his manner and deportment seemed simple. Thinks defendant was with him; thought there was some confusion in the family at the time; thinks complainant went off with defendant. The carriage was waiting; saw no such preparation as that complainant's wife was going away at that time; don't recollect seeing defendant's wife there that day.

*Cross-examined.* This visit was on the 1st, 2d, 3d or 4th of July. Her husband was with her. We took tea at complainant's; did not see defendant's wife there.

*Mrs. Susannah T. Smith*, for complainant. Is 35 years old; is a sister of complainant's and defendant's wife; recollects being at complainant's in company with last witness in 1833; saw complainant there; he and defendant were coming out of the door as we went in; saw there was confusion, but did not know what was the matter; saw no preparation as though complainant's wife was going away; don't remember seeing defendant's wife there that day; thinks she is confident she was not there when they got there.

*Cross-examined.* Thinks defendant's wife came there after she had been there some time.

*In chief.* Thinks she has a slight recollection of defendant's wife coming over just before tea. Thinks, if she came, it was about two hours after complainant and defendant had started.

*Jonathan Pitney*, for complainant. Is 45 years old; is acquainted with the parties, and has been for 20 years. Is a physician; has been complainant's physician from 1828 to this time. He attended him in a severe spell of bilious fever in 1828. He was sick afterwards; it was the chronic disease of the liver. Visited him occasionally, but not frequently: on referring to his

books he finds it so.  He can state but very little from his own re-collection.   During the disease of the liver the complainant ap-peared absent.   Can't say that this disease was in 1832–3.   It was since the sickness in 1828.   Daniel Lake died June 4, 1843.

*Cross-examined.*   Complainant was delirious during the fever in 1828 ; he had a long time of sickness.   In that attack wit-ness attended him constantly, sometimes twice a day.   At times during that sickness it was difficult to keep him in the house ; he was desirous to get up and go out and wander.   In cases of bil-ious fever the patient is apt to become delirious ; generally, rea-son returns after the fever is over.   Thinks that during the sick-ness of 1828 persons had constantly to set up with complainant. If there had been anything remarkable in his last sickness, thinks he should have recollected it.   Did not see him frequently during his last sickness.   He appeared to go about part of the time ; sometimes he would come down to witness's for medicines ; at other times, when he got worse, witness would go up there. These facts witness states from his books and not from recollec-tion.   Recollects going to see him during his last sickness.

*In chief.*   It strikes him he has been sent for to see complain-ant when he had fits ; but when it was he don't recollect ; nor did he ever see him have a fit as he can recollect.   Heard persons about complainant say he had fits ; but never saw him have one. The disease of the liver did not confine him to his bed, only at times.   Can't recollect that when he was confined to his bed by the disease of the liver he had a fever ; but most likely he had. The patient is not very apt to become delirious under that fever. At the time he was laboring under this disease he did not appear to be the same smart, active, business man he had been before ; should not suppose he was.   Recollects going there one day and finding complainant lying on his back on the floor, with his knees up and his arms round his knees.   Thinks it was in the last sick-ness.

*Maria Tilton,* for complainant.   Is 33 years old ; the parties are her uncles ; she used to live in complainant's family ; went

to live with him in July, 1832, and left in 1837. Complainant was, during 1832 and '33, in a poor state of health; he was quite sickly during 1833; he was confined to his bed during that year, at times. Recollects his having fits during that year; recollects his having one fit in May, she thinks, of that year. After that fit, thinks he went to Absecom with defendant and his son John, the same day he had the fit. Recollects his having other fits during that year. The fits seemed to get more severe as they increased in number. He had several fits during 1833; but don't recollect how many. Recollects his having one fit in July, 1833; thinks she does; thinks it was July, 1833. During the year 1833 complainant did not go much from home without some person with him. He was, during that year, at times dumb and stupid; at times wild and frantic. During that year, from the knowledge witness has of him, living in the house with him, she did not consider him during that year competent for the transaction of any business of importance. Witness does not recollect any business of importance which he transacted in 1833. She has heard complainant's wife tell defendant that he had taken the advantage of complainant by getting him to execute a deed to defendant for his property when he was incompetent for the transaction of business. This was during the summer and fall of 1833. Defendant made very little or no reply that she recollects of. Has heard John H. Doughty say, in 1832, that the defendant would not suffer the complainant to.go by water any more. Heard John H. Doughty say, at the same time, that the complainant was not fit to do any business.

Witness was not at home, at complainant's, in the first part of July, 1833; she thinks she got home the 8th of July, 1833; has heard complainant's wife tell defendant that unless he would give up the deed complainant had given him, or make them some satisfaction, complainant would institute a suit against him; don't recollect any reply defendant made. Has heard her tell him this frequently during the time witness lived at complainant's. After July, 1833, as long as defendant visited complainant's while witness lived there, complainant complained to defendant about taking away his property. Has heard complainant call on defendant to give him up the deed, frequently, while witness

·lived at complainant's; can't recollect how often; but more than once. They used to disagree so much about the property that witness used to leave the room frequently when they were disputing. These disputes were after the deeds were executed.

*Cross-examined.* When she lived at complainant's he was a man of intemperate habits; drank hard. The severe fit complainant had, that I spoke of, happened just after I returned home in July, 1833, as near as I can recollect. Doctor Pitney attended him in that fit, I think; I think he was quite unwell for two or three days, so as to be confined to the house. Do not know of complainant's doing any business in 1832 or '33. When complainant had those severe fits after May, 1833, Doctor Pitney was sent for generally. Don't recollect of his being there in the fit in May, 1833. Sometimes when we would see the symptoms of these spasms coming on him, his wife gave him medicines the Doctor had left for him, without sending for the Doctor. I did not see him have all the hard spasms; I saw him have a good many. Thinks that in the fall of 1833 complainant got better. Witness lived with her aunt, the complainant's wife, as a hired girl.

### TESTIMONY FOR DEFENDANT.

*Jonas M. Smith,* for defendant. Is 44 years old; has been acquainted with the parties 15 or 20 years. He bought of complainant and defendant, in July, 1833, one-sixth of the schooner Uriah, and sailed her until Feb'y, 1835. During the spring and summer of 1833, complainant and defendant sent out bills for different articles, which I brought them. For the most part he settled every trip. Don't recollect of ever settling with complainant. During the spring and summer of 1833, complainant sent bills by witness for goods. Considered complainant, during that spring and summer, capable of transacting business. In witness's opinion, in all the business he transacted with complainant during that spring and summer, he considered him competent to perform it.

*Cross-examined.* Has no bills at present with him in his pos-

session to freshen his recollection whether he bought any goods for complainant in the spring or summer of 1833 ; but feels satisfied in his own mind that he did buy goods for complainant during that time. Has no recollection of purchasing goods for complainant during June and July, 1833 ; but is satisfied that he did during the year 1833. Has no recollection of complainant's sending any bills for goods during those months; but he did during that year. From Feb. 1833 to Feb. 1835, has no recollection of settling any of the freights with the complainant. He bought goods for Nathaniel during 1833 ; but will not confine himself to any particular month during that year. Thinks bills were sent by complainant during that year. He overhauled some of his vessel bills yesterday, but was in a good deal of a hurry. Has no recollection of seeing any, in overhauling yesterday, of complainant's, dated in 1833.

*John P. Cramer*, for defendant. Is 44 years old; has been acquainted with the parties 16 or 17 years. About the 1st of April, 1833, he commenced working for Wm. Pine in making coal on land of the parties, and worked as late as November. He called on complainant to move him from Wrangleborough to the coaling. Complainant agreed to send his team, and in the morning John Colyer came with the team. During the time he worked at the coaling he was in the habit of seeing complainant constantly ; sometimes oftener than others. During the time I worked at the coaling I considered complainant a man capable of transacting business ; never heard or saw anything to the contrary until lately. Recollects calling at complainant's the night of the 2d of July, 1833, for his horses and wagon to go for a woman to attend witness's sick wife. They had gone to bed, I think. Think complainant got up and called John Colyer ; Colyer got up and helped witness gear the horses.

Recollects being at complainant's after that, when he had a lot of clover to mow ; is pretty near positive it was after that time. Complainant called in several persons to try the scythe. Thought complainant appeared perfectly rational and sensible and capable of doing business at that time.

*Cross-examined.* The nearest of the coaling was a quarter of a mile, and the farthest a mile and a half from complainant's residence. Was not in the habit of seeing complainant frequently previous to 1833; perhaps once or twice a year. Witness was at the mill sometimes once a week, sometimes twice, and sometimes not at all during the week, while working at the coaling; but when he was at the mill he generally saw complainant there or about home. Don't know of complainant's having any fits that year. Never heard anything about his having any fits that year, till a short time ago. During that time he was not very often in complainant's house; was there, he expects, two or three times. Complainant was in the kitchen part of the house, the night of the 2d of July, 1833, when witness went to the door. He called Colyer and went to bed again, witness supposes. Don't recollect having seen complainant that day before. Don't know that he has, particularly, any recollection of having seen complainant on the 4th of July, 1833.

In 1836 he coaled for complainant on the south side of the south branch of Absecom, above complainant's house. Don't know what tract that was on. It was, the nearest, half a mile, probably a mile, from complainant's house, and extended a good deal further. Is positive defendant never forbid his coaling for complainant in that place in 1836.

*Mrs. Abigail H. Blackman,* for defendant. Is 25 years old, and a daughter of defendant. Recollects complainant's coming to defendant's house in the forenoon of July 4, 1833. He went into the other room with father and brother John ; staid there a while, and then came out and went home. At noon father sent me with the deeds to complainant's. Witness took the papers defendant gave, and he told her to give them to complainant, and for him to read them. Witness took the papers and gave them to complainant. He was wiping himself at the towel ; witness told him what her father told her to tell him ; complainant told her to lay them down on the table and after dinner they would read them. It was washing day in our family that day. My mother had intended to have gone down shore that day. Mother went over to complainant's in the afternoon

of that day;  In the morning when witness saw complainant at her father's, and when she took the papers to him, he appeared to be in his right mind and perfectly rational.  The day after the 4th of July, 1833, complainant came to father's house, with his wife, and took my mother to see Mrs. Cramer and her young child.

Mr. Lake asked complainant's wife first to sign the deeds; she did not sign them, but said she would rather look over them. She asked Mr. Lake if she could sign them at any time; he said she could, and then turned to my mother—" thee not rather, if Sally (complainant's wife) don't choose to."  This was the day after the 4th of July, 1833.

The families of my father and uncle were on terms of closest intimacy, and continued so till I left my father's house, on my marriage, in 1841.  Witness was in the habit of visiting complainant's house several times a day, and lived there at times. Never heard or knew while she visited or lived there that complainant was incapable of transacting business for himself; has seen him doing business in his own house in 1833.  Never heard complainant's wife complain of the dissolution of the partnership.

*Cross-examined.*  She was in her 13th year on the 4th of July, 1833.  She did not read the papers her father sent her with; knows they were deeds by her father's telling her so. Never saw complainant have a fit during 1833, but has heard of his having them.

*Charles C. Murphy,* for defendant.  Is in his 30th year; the parties are his uncles; he went to live with complainant in May or June, 1832, and lived there till Feb. 1834.  Exhibits D, E and F.  Complainant's conduct and actions at the time of the execution of the papers E and F was about the same as they had been previous to that time, some time before and some time afterwards.  Exhibits G and H.

*Cross-examined.*  Has no recollection of Exhibit D being read in his presence when he subscribed it as a witness.  Don't know

whether it was executed on the day it bears date or not.    The whole of the body of the instrument is in  John H. D.'s writing. Recollects that the complainant, during the years 1832 and '33, was not what a man ought to be.    Recollects hearing that he had fits during that year.    Never saw him have a fit ; has seen him soon after he had one ;  once, in particular, during the year 1833. During that summer he laid about ; sometimes under the tree, and sometimes on a bench under the tree.    Thinks that during that summer he did in some measure neglect his business.    Has no recollection of the day or the month when Exhibits E and F were executed.    The actions and conduct of complainant at the time of executing these papers, and some time before and some time afterwards was such that witness would not have been willing for him to have transacted such business for witness ; though he might have been capable of transacting such business. Don't recollect seeing the interlineation of the words " except where the sawyer's house stands," in Exhibit F at the time of its execution ; thinks these words are in defendant's writing. Recollects complainant's being at a camp meeting, at Catawba, in Aug. 1833 ; his wife was with us, and the defendant's wife. Believes complainant had a fit on the camp ground that day. Saw him soon after, and was satisfied from his appearance that he had had one of those fits.    Recollects hearing that complainant had conveyed away his property to defendant, and complainant's wife was dissatisfied about it ;  but whether it was the deed of conveyance or the articles of dissolution he can't say ; may be both.    Exhibits G and H are all in  defendant's handwriting, except complainant's signature.

*In chief.*    The reason why I considered complainant, during the years 1832 and '33, was not what a man ought to be, was because I thought he drank too much liquor.    The reason why I would not have been willing for him to have transacted business for me was pretty much for the same reason ;  that I considered he drank too much.

*Cross-examined.*    Complainant drank very hard during 1832 and '33, I thought.    During 1833, when he drank so much li-

quor, I should not have been willing to have had him do business of importance for me. Would not have been willing to have trusted him to transact business of importance for me during 1833, no how.

*In chief.* The main reason was because he drank too much, and another reason he had those fits or spasms. I considered these fits or spasms to have been brought on by his drinking too much.

*Hezekiah Steelman,* for defendant. Is 42 years old; has been acquainted with the parties several years. He acted as sawyer at the mill from March, 1831 to Nov. 1833. Some time before I left the mill, the business as with complainant and defendant was separated, and I worked and sawed for each of them separately. After the separation, defendant's logs were brought to the mill as they were before; but the complainant's were marked with a charcoal mark so as to distinguish them. Complainant, after the separation, would sometimes come to the mill, take charge of his lumber, and give directions as to how he wished it sawed. Before the separation, sometimes complainant and sometimes defendant would give directions as to the sawing of the lumber. During the time I sawed for complainant and defendant and for complainant himself, I considered complainant sometimes capable of transacting business, and at other times not capable. Should suppose that when complainant came to the mill he was oftener not capable of transacting business than capable. The reason why I thought he was sometimes not capable when he came to the mill was because I thought he had drank too much liquor. Sometimes, when he came to the mill, I considered him as capable of transacting business as when I first knew him in 1831; but he hardly ever came to the mill but what I supposed he had been drinking some liquor.

*Cross-examined.* Saw complainant have one fit while I was at the mill; he got upon the hill and was taken with it. Was at complainant's house afterwards; came there while he had another fit on him; can't tell the year; it was while I lived at

17

the mill.  Sometimes from Jan. 1 to Nov. 20, 1833, I would have been willing that complainant should have transacted business of importance for me.  He was very frequently during that period incapable of transacting business; on account of his drinking too much was the reason I considered him incompetent for the transaction of business.  Part of the time I coaled for complainant in 1833 and '34, was on a tract above a little spring called Tarkiln.  Defendant never forbid me coaling there for complainant.

*Reading Imlay,* for defendant.  Is 36 years old; has been acquainted with the parties 12 or 14 years; contracted with complainant for finishing a house for him in Nov. 1833, on the Peggy Leeds place; considered him then competent to transact business.

*Cross-examined.*  During November and December, 1833, complainant drank very hard; while in liquor would not have trusted him to do business of importance for me.  When not under the influence of liquor, he would have trusted him to do such business for him.

*Uriah Adams,* for defendant.  Is, he believes, as much as 45 years old; has been acquainted with the parties 20 years; was employed for them in 1831, in screwing up a vessel on shore; complainant was the main man then in superintending and directing the work; he was at times while there very much in liquor, as far as I could judge; he would often go and lay down when under the influence of liquor.

I considered complainant, from the time of screwing up the vessel, in 1831, to the time of my selling him my property, in 1839, a man capable of transacting business for himself.  During all that time, in all the business I had with him, and as far as I knew him, I could see no difference with him as to transacting his business, except when he was in liquor and when I saw him sick, in 1828.  He was at that time very sick, and they did not expect him to live.  From 1831 to 1839, I did a great deal of

business for and with complainant, and saw him frequently when I was at home.

*Cross-examined.* Has no recollection of signing Exhibit I on the day it bears date, further than appears from the date of the paper itself. He don't recollect any business he had with complainant from April, 1833, up to January, 1834. He is now at work for defendant, building a vessel for him.

*In chief.* Is perfectly satisfied that Exhibit I. was signed by him on the day it bears date.

*Jonathan Pitney*, called for defendant. His examination was objected to ; but an order had been obtained by the defendant for his re-examination.

He finds by referring to his books that complainant had a very severe spell of sickness in 1828. The first charge in 1833 is May 24. He gives the different charges on his book, running through May, June, July, August, September and November, 1833. Is satisfied that complainant's chronic disease of the liver commenced in 1832 ; that is, he commenced treating him for it that year. I state this from using a particular medicine that relieved him that I had never used before for that disease. The medicine I gave him for that disease and the disease together did not wholly incapacitate him for business. While he had this disease and was taking medicine he was in the habit of drinking spirituous liquor ; but not by my advice. He had pains in the bones of his legs, knees, back and sides. I called the pains the rum gout. During all the time I have known complainant he has been in the habit of using spirituous liquor in some shape or other. When not under the influence of liquor he is a sensible man, and as capable of transacting business as ordinary men. Presumes that complainant sometimes called for the medicines himself at my house, at the times charged in my books. Can't recollect seeing complainant in the months of June or July, 1833, when he was of unsound mind or crazy. In 1828 his sickness, while it lasted, caused delirium. He don't recollect ever seeing him have a fit. My impression now is that the fits they said he had were caused by excessive drinking.

*Cross-examined.* I rather think, judging from the medicine I gave complainant, that I treated him for the chronic disease of the liver in 1833. I see by my books that on the 6th of June, 1833, I gave him a remedy that I had given him before for that disease and pains in his bones spoken of in his examination in chief, and is the same medicine I gave him in 1832 for that disease and the pains, and which relieved him, and which I never used before for that disease that I can recollect of. The charge on my book on the 15th of July, for visit and medicine, it does not appear what the medicine was; and the charge on the 16th is the same way.

I have said in my examination in chief, that the chronic dis-- ease of the liver and the medicine I gave him did not wholly incapacitate him for business; but disease, medicine and liquor, when he drank too much, made him incompetent for the transaction of business. I think while he had this disease and was taking this medicine he drank more or less liquor every day; such is my impression. I might have seen him in the months of June and July, 1833, when he might have been incompetent for the transaction of business, and I have no recollection as to the months; and he might have been so during those months and I not have seen him. I have no personal recollection as it regards time.

*In chief.* I did not conceive that the medicine I gave him for the disease of the liver and his pains, in 1832 and '33, made him incompetent for the transaction of business; but it was the liquor, combined with the disease and medicine, that rendered him incompetent for the transaction of business. If he had have been of unsound mind or crazy for any length of time continuously, I should have recollected the fact.

*Dr. Mahlon Canfield,* for the defendant. Is 48 years old; is acquainted with the parties; lived in Atlantic county 14 years; was Collector there; always knew the parties while he lived there; lives now in Morris county. Exhibits K, L and M on the part of the defendant being shown to him, he says he is the subscribing witness to each of them; and Exhibit N being shown

to him, he says he is one of the subscribing witnesses to it. He has not the slightest recollection of the transaction: he only speaks from seeing his signature to the papers.

*Cross-examined.* The bill of sale marked K is filled up in the handwriting of his wife. The filling up of Exhibits L and M is partly in the handwriting of his wife and partly in his writing. He was at the house of complainant a good many times while he lived in Atlantic county. He went there in 1825. Complainant appeared to carry on and conduct the partnership business while defendant was Sheriff. Complainant was an active business man at that time ; very much so. Remembers complainant's having a severe turn of sickness ; thinks it was in the fall of 1828. Did not consider complainant the same shrewd business man after that sickness that he was before. From the time of his sickness and for several years after, my impression is clear that he was not a man fit to do any important business. I would not have felt satisfied in making a deal with him ; if he offered to trade horses or carriages, or anything of the sort, I would not have dealt with him. The time of the execution of the papers K, L, M and N, would have come within the time when I considered the complainant incompetent to do business, although I have no recollection of anything that took place at the time of the execution of the papers. He was a practicing physician when he resided in Atlantic. Exhibit A on the part of complainant, and Exhibit N on the part of the defendant, are in the handwriting of John H. Doughty.

*In chief.* When he first went into Atlantic he went into partnership with Doctor Pitney. We lived in the same house while we were partners, about two miles from the complainant's. Quit partnership with Doctor Pitney, and removed to Bargaintown, in 1827, about seven miles from the complainant's. Did not attend complainant regularly in his sickness in 1828. Doctor Pitney was his physician. I saw him once during that sickness. His disease was bilious fever. For six or seven years after complainant's sickness in 1828, I considered him incompetent to do business.

*Cross-examined.* Met complainant after his sickness in 1828 much more frequently than I went to his house.

*In chief.* My meetings with him were altogether casual. I was always in the habit of talking with him when I met him. He was in the habit of using spirituous liquors freely; *it was a daily* practice with him to drink. He was frequently under the influence of liquor, but I never saw him down.

*John H. Doughty,* for defendant. Is the son of defendant; was born Nov. 1, 1816; thinks he heard the parties talk about dissolving partnership three or four times before they did so; heard them talk about it as they were riding in the wagon from home to Absecom or from Absecom home. Think I heard them talk about dissolving in 1831; think it was in the spring of that year. The first I heard of this conversation was at the complainant's place, in the door yard. Don't remember who commenced the conversation; thinks he came up while they were talking about it. After I came up they had some conversation about dividing the horses and as to the manner of dividing them. I think it is likely I left them before they finished the conversation.

I heard them talk about dissolving in 1833, just before they did dissolve. I don't know which party first proposed the dissolution; they talked about it before they came to terms.

One morning my uncle came over to my father's; this was the morning of July 2, 1833; my uncle said to my father: "Enoch, I am tired of doing business this way, and let us dissolve." Father replied, "What way do you want to dissolve?" My uncle said, as near as I can recollect, "You take and make me and my wife a deed for your part of the 100 acres where I live, and your part of the Peggy Leeds place, and let me keep my half of the salt meadow, my half of the twenty acres, and my part of Zack's meadows, and I will make you a deed for all the rest." Father then said to him, as near as I can recollect, "When shall we get the papers drawn?" My uncle said to him, "Have it done right away." I think father asked him who he would have to draw them. I think my uncle replied, "You can set John to

draw them." As near as I can recollect, they then talked over about the teams and other property, debts and the like. They agreed that they should draw the articles of agreement for the balance of the property. I drew the deeds between them ; I mean the deed from my father to my uncle and his wife, and from my uncle to my father. Exhibit N on the part of the defendant, and Exhibit A on the part of complainant, are the two deeds I have just spoken of. The body of both deeds are in my writing. I had before me a large bundle of deeds and title papers when I drew these deeds. Part of them my father gave me, and part of them my uncle brought over from his house and laid them down on the table. The deeds my uncle brought over were, as I understood, a part of the chain of title papers. I begun the deeds on the 2d day of July, and finished them on the morning of the 4th of July. They were signed on the afternoon of the 4th of July. They were signed and witnessed at the house of Doctor M. D. Canfield, in Bargaintown. They went there to make some bills of sale of vessels which they had held in partnership. Exhibits K, L and M, on the part of the defendant, being shown to him, he says he believes them to be the same bills of sale which were executed that day. The deeds were taken along to be executed at the same time. He drove up by Daniel Lake's from Doctor Canfield's, and the deeds were acknowledged before Daniel Lake. The body of Exhibit E. on the part of defendant is in his writing. The signatures to it are the signatures of my father and uncle ; it was executed by them in my presence ; I recollect its being signed by them. The body of Exhibit F. on the part of defendant is chiefly in his handwriting ; some little of it is not. It is all in his handwriting except a little that my father wrote and a little that my uncle wrote. The part my father wrote is interlined between the 5th and 6th lines from the top ; the words are, " except where the sawyer's house stands." The part my uncle wrote consists of four lines near the bottom, commencing with the words " blocks and rigging," and ending with the words " also at home." My uncle also wrote the words " signed, sealed and delivered in the presence of." I commenced drawing these papers E. and F. in the afternoon of July 5th, and finished them in the morning of July 6. I did not frame the instruments myself, but copied them

from a draft that was furnished me. My uncle furnished me with the draft : to the best of my recollection it was in his writing. As near as I can recollect, I just copied after the draft he gave me. These two papers, E. and F., were signed at my uncle's house, on the porch on the north side of the house ; Chas. Murphy was there and signed them as a witness. *I think* these papers were examined by my uncle before they were executed. There were duplicates of the papers E. and F. executed that day, and each party took one. Before the papers were signed I read one of each kind aloud so that they all could hear, and my uncle looked over the others while I was reading, and saw they were right. Uncle's wife was present during all this time. I don't recollect of her objecting to anything. After the papers were read over, my uncle's wife said to my uncle, " You might as well have the old sorrel horse in, for he is old and worn out, and Enoch (the defendant) would work him to death," or something like that. Father agreed to it, and I then put in Exhibit E. the words " and the old sorrel horse." I think the papers had been all left unfinished so that anything might be added. I mean that I left off the attesting part at the foot of the instruments. They were all finished before they were signed and sealed by the parties. The papers which were executed by my father and uncle, and taken by my uncle, were duplicates of E. and F. to the best of my recollection. I think the part of F. which I have described as being written by my father and my uncle was written that day, at my uncle's house, before the papers were executed. Before father and I went home that afternoon, we went to uncle's barn and removed over home the teams which had been set over as my father's share ; my uncle knew we took them. I think he saw us do it. He was down at the barn, but whether he assisted us I do not recollect. They kept a small store. There was a little coffee and sugar divided between my father and my uncle. The store was kept near uncle's house. I went over sometime the next week; think my mother sent me. Some sugar and coffee were given to me. I told them I wanted father's share of the groceries, and these were given to me ; I took them home. My uncle is a capable business man—so considered generally. He has been so considered since I knew him.

To a question put by defendant's counsel, whether complainant was entirely competent to do business when he executed the deed, he says he was.  To the question : was the complainant in full possession of his mental faculties when he executed Exhibits E. and F. ? he says he thinks he was ; he has no doubt of it. To the question : From your uncle's condition and conversation on the 2d, 3d, 4th, 5th and 6th of July, 1833, have you any doubt of his being in the full possession of his reason and mental faculties and capable of transacting the business which he did then transact ? he answers, I have no doubt about it ; I think he was fully capable of transacting the business which he then did. I don't know of his being deranged or in any way out of his mind during the months of June and July, 1833.  In making the dissolution of the partnership, and in executing the instruments and papers which were then executed, he appeared to understand fully the nature of the business he was doing.  A part of the property conveyed to the complainant was called the 100 acre tract; another part was called the Peggy Leeds place.  Complainant lived on what was called the 100 acres.  Since the dissolution of the partnership, complainant has used separately the property set off to him as his own separate property.  He took and used the personal property set off to him also as his own. Since the dissolution my father has always had the separate use and control of his own share of the property.  Uncle, right away after the division, tore down the barn on his part of the property or belonging to his part and re-built it right away, the same season.  The barn that was taken down I have understood was not on the 100 acre tract, but it was always used with the house.  He moved it across the road upon what I understood was the 100 acre tract, and put it up again, part of the old timber and part new timber.  I think they tore the barn down the next week after the articles of dissolution were executed.  It was put up again on the 100 acre tract; within two weeks, or three at farthest, the barn was raised again.  I suppose this was done under the direction of my uncle ; he attended to it.  Complainant has since built a house on the Peggy Leeds place ; the house was commenced in August or September, 1833, and was raised that fall.  I have understood that my uncle has sold part of the

Peggy Leeds place, to one Gilbert Miller. I have been on the property described in Exhibit O. It is a part of the Peggy Leeds place, as I always understood it. I never saw the Peggy Leeds place run. Miller has built a house on it since he bought it. Part of the Peggy Leeds place was woodland at the time of the dissolution; I understood complainant had it cut off. The wood was sold or disposed of by him; a part of it was burnt into charcoal. He sold me about 20 cords of that wood. This was after 1840, and before 1844. I asked my uncle about this wood, and he said I could have it. I gave uncle credit for it in my books. I gave him credit for the number of cords, I think. I then kept a store, and uncle had dealings with me and he had an open account. Father and I went into business together in May, 1840, in store keeping. Uncle has not dealt with the firm since 1844. Uncle frequently paid his workmen by his individual orders on the store ; Exhibits P., Q., R. and S. are four of those orders. I suppose I have at home 100 orders of the same kind. Since the dissolution uncle has always occupied the cleared land south of the mill as mentioned in Exhibit F. He has occupied the sawyer's house and the land it stands on, part of the time, since the dissolution. He once showed me the line of the 100 acre tract, and told me that one of the lines took in the sawyer's house. He claimed the sawyer's house as his, and I don't recollect that my father has ever occupied it since. Since the dissolution my uncle has always used and claimed the cutting privilege on the property described in Exhibit F. Since the dissolution my father has always carried on business by himself, except his partnership business with me. He has, ever since, held and enjoyed the property set apart to him as his own separate property.

He speaks of conversations between his uncle and father, in 1831 and '32, about their law suits with others, respecting the boundaries and title of tracts set off to his father when they dissolved. Part, if not all those suits, were pending at the time of the dissolution.

Father made various improvements on the land set apart to him. He removed the old dwelling-house, and built a new one. This he commenced, I think, in the fall of 1834. He has built

two other small houses on the part set apart to him, on what is called the mill tract; one, I think, in 1844 or '45, and the other last year. One was built before this suit was commenced; but I don't recollect positive about the other. My father also built a third house on a part of the property he got at the time of the dissolution, called the Brown place. This was built two or three years ago. Ever since the dissolution father has used and occupied, separately and by himself, the mill. The re-building of the mill was commenced in 1841, and finished early in 1842. I assisted in raising the mill; father was then at home. Uncle took no part in superintending or directing; he had nothing to say. Uncle lived at home while the building the houses and mill was going on, and could see what was going on every day.

After the dissolution my uncle sometimes brought logs to the saw-mill to be sawed. I have known logs to be brought there by other people; but it is a very rare thing. Uncle's logs were always marked in a particular way, so that they might be known. Sometimes they were marked when they came to the mill, and sometimes after they got to the mill. After the dissolution, my uncle's lumber, when sawed, was always kept by itself, to the best of my recollection. That was not the practice before the dissolution. I have seen my uncle's team-drivers mark his logs sometimes; they were generally marked by his workmen; I never saw anybody else mark them.

On the next Monday after the articles dissolving the partnership, E. and F. were signed and executed by the parties. I remember returning from Absecom with my father, in a wagon, and as we passed uncle's door, I recollect uncle's asking my father if he could let him have some money to pay his harvest men with; I think he asked for $2 or $3. I think my father said he had not it with him; but when he went home he sent me back with the $3, after dinner. I handed it to uncle just as father handed it to me. Uncle's people harvested the next day. I was over there in the afternoon while they were at work. My uncle was in the field in the afternoon, and I think he helped carry some of the rye together, or helped shock it. After the harvesting was done, I think the next week, I heard that my uncle had a fit. According to the best of my recollection, it was in

the forepart of the week that I heard this. After I heard it, I went over to uncle's, the same day. They called it a rum fit. I understood it was the same kind of one he had before, and that I saw him have. The one I saw him have threw him down, prostrated his whole sytem and twitched his limbs. I saw him have the fit in May, 1833. He then recovered in about half an hour. It came on him, at that time, while we were hitching the horses to go to Absecom. After he recovered he went to Absecom, the same afternoon. I remember uncle's being sick in the fall of 1828. The Doctor said he had the bilious fever. That fit of sickness, as near as I can recollect, began in August, and he was out again the last of October of that year.

Exhibit Z. on the part of defendant is in his handwriting. The signature of complainant to it is in his writing. He has no recollection of the time it was executed. He supposes it was on the day it bears date, or about that time.

Thinks uncle was over at father's several times while I was drawing the deeds. I recollect he was over there one day, and asked father if the deeds were done.

*Cross-examined.* The first time I heard uncle and father talk about dissolving was in 1831. Don't recollect any other person being present but myself. 1 don't recollect hearing them talk about it again until they did divide, in 1833 ; think in the latter part of June, 1833. No one else was present but myself. The next time I heard them talk about it was on the 2d of July, 1833. That was over on my father's side, on that place where my father lived. It was about 20 or 30 yards from father's house. There was no one else present but myself. I had no orders from the parties that morning to draw any bills of sale for any vessels. I think there was over 60 acres in the Peggy Leeds place. There was no house on it at that time; supposes there was about 20 acres of farm land on it, besides the banked meadow. I always heard the other place called the 100 acres. There was, I suppose, about 25 or 30 acres of farm land in that ; the balance was pine timber—some oak interspersed, but called pine land. I began to draw the deeds on the 2d of July. I don't recollect that I consulted my father while drawing the deeds. I

think my father laid the deeds down before me and told me how to draw them, that is, the descriptive part of the deed; I mean the description of the property. Uncle brought a small bundle of deeds over there, and my father had some; but whether I drew my father's deed from the one or the other I cannot tell. I cannot name the deeds my uncle brought over; I understood they were title papers; I don't recollect whether I understood this from my father or my uncle. I remember my father's giving uncle some deeds that belonged to the 100 acres, and the Peggy Leeds deed, or the old deed for the Peggy Leeds place; and I think my father kept the others that related to the land that he had. My uncle brought the deeds over on the 3d of July, Wednesday. My uncle, after we separated that morning, went right over the dam towards home. Father and myself went over to uncle's, and we all three went to Abseeom that forenoon. We generally drive our horses under the shed at the tavern at Absecom; don't recollect whether I went into the tavern or not; father and uncle, to the best of my recollection, went into the tavern. Don't know what their object was in going to Absecom. I went after paper to draw the deeds on. Think I commenced one of the deeds in the morning of the 2d of July. Think I had but one sheet of paper, and I quit till I got the paper I have spoken of, and I re-commenced that afternoon. Think I went on with the same deed I first commenced; that was the deed from uncle to my father. I did not go on with the same sheet of paper I had commenced with in the morning. I had made a mistake in it, and hove that away and commenced again. I had not got to any description. Father was in the room with me part of the time while I was writing that deed. The room was considered a parlor in those days. Father told me to copy the description of such and such property from the deeds he laid down. Think I got the deeds done about 10 or 11 A. M. of the 4th of July. I think I gave them to my father after I finished them. I next saw them again after dinner that day; uncle had one or both of them in his hands then, in his own house. Father was then at uncle's house. I was in the room where they were; I remember my uncle's wife being there. I think there were other persons there; think they were women

and girls. It was about two or half-past two. I was 17 the November following. After the dissolution the principal articles of personal property which my father took possession of were 6 mules, a very poor lot of gear, four horses, three heavy wagons, one light wagon, one sulkey, some old harness with these horses, one set of ox-chains; that is about the principal that I recollect, excepting the vessels and vessel property. There was some lumber at the mill; there might have been 10 or 15,000 ft. Father did not get possession of the whole of that lumber; uncle got a good part of it; think it likely he got half of it, likely not so much, likely more. There was considerable cord wood and coal wood cut, and uncle got a part of the cord wood. At a rough guess there was from 600 to 1,000 cords of coal wood cut. I don't know how much of the wood uncle got; he was to have 200 cords of cord wood in the division. I don't know how much he got; I saw him take some. Uncle kept the oxen, and father took the steers; there was one yoke of each.

Father, uncle and I went away from uncle's together in about half an hour after father and I went over to uncle's on the 4th of July. We went to Doctor Canfield's. I did not see the deeds from the time we started from my uncle's till we got there. When we got there I think my uncle had one deed and my father the other. They laid them down on the table and said they might as well sign them there before the Doctor. They signed them there.

I don't recollect anything being said before I left uncle's house what we were going to Doctor Canfield's for. I don't know whether these deeds were examined by my uncle and my father, or either of them, while they were in the kitchen at uncle's. I heard father ask uncle if he had read them, and he said he had. I think I saw the deeds, one or both of them, lying on the table at uncle's before we left for Doctor Canfield's on the 4th of July.

On the dissolution of the partnership uncle took a pair of grey horses, a sorrel horse, a new farm wagon, gears for the horses, riding chair and harness. He retained one-third part of the schooner Uriah and all his stock of neat cattle and sheep. There were several head of cows and calves and a good many sheep.

My father did not get as many head of cattle as my uncle got, and he got no sheep. The sorrel horse was said to be old, and I suppose he was.

1 saw uncle on the 5th of July. He had neither of the deeds then that I know of. He took one of them after they were signed at Doctor Canfield's, and father took the other. I saw uncle take one up and put it in his hat; and I saw him afterwards hand it to Daniel Lake. I never saw the deed in uncle's possession after he handed it to Daniel Lake. The division of the mules and wagons and such like was made on the 6th of July.

Uncle's wife gave me the coffee and sugar mentioned in my examination in chief. It was not weighed to me. Father's family were in the habit of going over to uncle's and getting groceries. The groceries and provisions of the firm were kept over there. When I went over there to get groceries for my father's family, it was the usual habit to hand them to me without weighing them.

I saw my uncle on the 5th of July, the day after the execution of the deeds, at his own house. I think aunt and likely the whole family were present, but I don't recollect positively. I don't recollect anything about the deeds being mentioned; I mean the deeds executed the day before. My uncle, on the 5th of July, handed me a paper and told me to copy it. The contents of the paper which uncle gave me to copy are embodied in two papers which have been exhibited here. I don't know that I have ever seen the paper which he gave me to copy since the 6th of July, 1833. I have no recollection of what I did with it. It had no name to it when he gave it to me. I don't recollect whether it had a date to it or not.

Being asked by the counsel for complainant whether he made a copy of that paper, he says he thinks he did. He copied the paper and made these two copies which are here. I don't recollect whether uncle gave me one or two papers to copy. To the best of my knowledge, I made the two copies marked E. and F. from the paper or papers my uncle handed me. I can't say positively whether my uncle handed me two papers or only one. I think they were exact copies of the paper or papers he handed me, nearly as I can recollect. My memory don't serve me what became of the papers he gave me. I think I carried the papers

over to my uncle myself, after I had copied them ; did so on Saturday the 6th of July, in the forenoon. I gave my uncle four papers on the morning of the 6th of July.

Being asked whether he means to say that the papers he then gave his uncle were exact copies of the paper or papers his uncle had given him the day before, he says two of the papers he gave him were like Exhibit F., and the other two like Exhibit E. So far as one of these Exhibits is in my writing, I think it is an exact copy of the paper he gave me, so far as I can recollect. The other Exhibit was written down to where the words " the old sorrel horse" are added ; and I think those were copies also of the paper uncle gave me. The paper or papers he gave me to copy were in his own writing. Has no recollection of the original paper or papers and the copies being compared together. I don't recollect whether I had any conversation with my father about these papers or the copies previous to or while I was making the copies. These papers were executed on the afternoon of the 6th of July, in the porch on the north side of the house. I don't recollect that I have ever seen among my father's papers the original paper or papers which my uncle gave me to copy.

On the 4th of July, 1833, when we went from Doctor Canfield's to Mr. Lake's, father and uncle went into the house with Mr. Lake ; I did not go in ; I stayed and minded the horses ; father told me to do so.

There was, I think, 8 or 10 acres of meadow belonging to the Peggy Leeds place. There was 20 or 25 acres of farm land on the part my father lived on. I think uncle's house, at the time of the dissolution, take it on an average, was fully as good as father's.

*J. C. Smallwood* states the office of Sheriff to have yielded defendant $7,000, subject to expenses and his charges as agent &c.

*Jeffers* and *Browning*, for the complainant. They cited *Highmore on Lunacy*, 103 ; 2 *Green's Ch.* 357 ; 4 *Wash. C. C. Rep.* 583 ; *Shelford on Lunatics*, 2, 274, 276, 379, 280 ; 2 *P. W.* 270 ; *Fonbl. Eq.* 67, 8 ; 9 *Pet. Rep.* 416.

*J. Wilson* and *P. D. Vroom,* for the defendant. They cited
2 *Stark. Ev.* 932; 3 *Mass. Rep.* 330; 7 *Searg. & Rawle,* 92 ;
8 *Ib.* 573; 8 *Mass. Rep.* 371 ; 1 *Green's Ch.* 11, 87; 3 *Ib.*
305; 1 *Story's Eq. Jur.,* sec. 529, sec. 231 ; *Angel on Lim.* 9,
168 ; 9 *Pet. Rep.* 416 ; 3 *Bro. Ch.* 633, 647 ; 2 *Jac. & Walk.*
151; 3 *Ves. Jun.* 583; 17 *Ib.* 96 ; 2 *Stark. Ev.* 26.


THE CHANCELLOR. The answer in this case is a very labored
production, containing a great deal of argument and a great
amount of verbiage. But, it is not only a failure as an answer,
by its omission to respond to several very essential matters ; but
a careful observer, who will take the labor of studying it, after
having read carefully the testimony in the cause, cannot fail to see
its illusory character, and the care which has been bestowed on its
frame and language. It is apparent that the " *mens conscia
sibi recti* " is not in it. The defect of the answer is, no doubt,
chargeable to the person who furnished the draft of its statements
to the solicitor.

First, as to its omissions : The bill, from its nature and
charges, called on the defendant to state what the partnership
property, or the property held in common between them, consisted
of, as well real as personal property ; including the debts due the
partnership. The bill charges, that there were 1,000 cords of
pine wood ready for market, on a landing; 1,600 cords of wood
in the woods, ready to be made into charcoal ; a quantity of sawed
lumber at the mill, and 1,500 bushels of charcoal. All the an-
swer says as to this is, that there was some wood, lumber and
charcoal, but the precise quantity the defendant cannot state.
So, as to the debts due the firm, he says there were debts due
the firm, and that he has collected all of any importance, but
that he is unable to state the amount thereof.

So, the bill charges that the complainant and defendant put in,
as stock, an equal amount in the partnership. No answer is
given to this. These are some of the omissions.

They are all very material matters. The amount of property
and debts due the firm may enter very essentially into the ques-
tion involed in the case ; and the allegations, which seem to be
given in lieu of answers to these matters, that the complainant

18

knew or ought to have known what was the property of the partnership, cannot be received as an answer.

It is true that the answer might have been excepted to for such omissions; but the not excepting does not cure the defect; and if a defendant will take the responsibility of putting in such an answer, he takes the risk of the influence of its defects on the decision of the cause.

But there are much graver matters for the consideration of the court, growing out of the nature of this answer. I shall first notice its statements in relation to the vessels. It says that, in further carrying out their said agreement for dissolution and division, the complainant, on the 4th of July, 1833, by bills of sale, conveyed to the defendant five-twelfths of the schooner J. R. Rapelye, one-third of the schooner Sun, and one-twelfth of the schooner Uriah. That the shares of the said vessels were estimated between him and the complainant, and the estimated value put into the bills of sale as the consideration thereof; (the considerations stated are, $1,000 for the five-twelfths of the Rapelye; $1,000 for the one-third of the Sun; and $150 for the one-twelfth of the Uriah,) which, the answer says, was either paid by the defendant to the complainant, or allowed and satisfied to him in the settlement and division of the partnership business and property. This is a remarkable answer. Did he pay the complainant the consideration stated in these bills of sale? If he did, he certainly knew it, and would have said so. If he did not, why does he say he paid him or satisfied him in the settlement? This part of the answer betrays, at once, a consciousness of the wrong done the complainant and an insincerity in the answer, and apprizes the court of what may be expected to be found in other parts of it. Now, in reference to these vessels, the answer, in another part of its voluminous statements, (it requires great labor to reduce it to simples,) says that, after the dissolution, the complainant conveyed and delivered into his possession, or agreed that he should take, sundry property, to wit. : one-third of the schooner Sun, five-twelfths of the schooner J. R. Rapelye, and one-twelfth of the schooner Uriah, &c. That the said parts or shares of vessels were conveyed to him by the complainant by bills of sale under his hand and seal, dated July

4, 1833 ; and all the aforesaid articles of personal property, and of any other property whatever of the partnership, which he took into his possession, he so took under an express agreement and stipulation with the complainant for that purpose. And in another part of the answer he says, that at the time of the dissolution they held, as tenants in common in equal parts, two-thirds of the schooner Sun, ten-twelfths of the schooner J. R. Rapelye, and that each owned five-twelfths of the Uriah ; and that the complainant having, by said bills of sale, conveyed to him one-third of the schooner Sun, and five-twelfths of the schooner J. R. Rapelye, the complainant ceased to have any interest therein and the defendant became invested with all the interest in said vessels which had belonged to him and the complainant jointly, and was therefore entitled to use the same as his own ; and that, the complainant having conveyed to him, by one of said bills of sale, one-twelfth of the schooner Uriah, he became the owner of six-twelfths thereof, and the complainant remained the owner of four-twelfths thereof.

It thus appears that the defendant got, by bills of sale from the complainant, all his share of the schooner Sun, valued at $1,000, all his share of the schooner J. R. Rapelye, valued at $1,000, and one-twelfth of the schooner Uriah, valued at $150, in all $2,150, without any consideration whatever ; and yet the answer, in a former part of it, has said that he paid for those shares, or allowed and satisfied the complainant therefor in the settlement and division of the partnership business and property. He seems to consider that because the complainant, in the so-called division, got a small part of his own half of other property, that is to be considered as a payment or settlement for the complainant's interest in these vessels.

We will next look at the answer in reference to the real estate, in view of the testimony of John H. Doughty, sworn for the defendant, and the only witness as to what passed at the interview between complainant and defendant immediately before the work of drawing the deeds was commenced.

John says that one morning his uncle (the complainant) came over to his father's (the defendant's) house ; it was the morning of July 2, 1833. That his uncle said to his father : " Enoch, I

am tired of doing business this way, and let us dissolve." Father replied, " What way do you want to dissolve ?" Uncle said, as near as witness can recollect, " You take and make me and my wife a deed for your part of the 100 acres where I live and your part of the Peggy Leeds place, and let me keep my half of the salt meadow, my half of the 20 acres, and my part of Zack's meadow, and I will make you a deed for all the rest." Father then said to him, as near as witness can recollect, " when shall we get the papers drawn ?" Uncle said to him, " Have it done right away." Witness thinks his father asked his uncle who he would have to draw them. Thinks his uncle replied, " You can set John to draw them." As near as witness recollects they then talked over about the teams and other property, debts and the like. They agreed that they should draw the articles of agreement for the balance of the property. The witness says he set about drawing the deeds for the lands right away, beginning with the deed from his uncle to his father.

This is the only thing in the nature of a proposal from the complainant that we have in proof in the case ; and, looking at the nature of the proposal and at the answers given by the defendant, it strikes me as very extraordinary, and would, of itself, very naturally suggest to any person acquainted with the amount and variety of property they held together an inquiry into the state of mind of the person who made it. It may be remarked, in passing, before proceeding to an examination of the answer as to the real estate, that, in this conversation detailed by John, nothing is said about the vessels ; and yet the defendant took from the complainant bills of sale for his shares in vessels estimated at $2,150, without paying one dollar of consideration for such shares. In this respect he seems to have gone to the letter, for " all the rest." But we proceed with the statements of the answer in reference to the real estate.

The answer says that, on or about July 2, 1833, the complainant made to the defendant a distinct proposition for such dissolution and division, and the same was considered and debated between them ; and at length the terms proposed by the complainant were, without much if any alteration or modification, agreed upon between them. What was the proposition

made by the complainant? Why not state it? Was it the pro-
position testified to by John? That is the only proposition in
proof.

The answer proceeds to say, that it was then, that is, at or
about July 2, 1833, agreed between them, that a part of the real
estate should be taken by the complainant and a part by the de-
fendant; that certain parcels of real estate should not be di-
vided, but continue to be held by them as tenants in common;
that the defendant should convey to the complainant
all the defendant's right and interest in the real estate
so to be taken by the complainant, and the complainant, in like
manner, convey to the defendant all the complainant's interest
in the real estate to be taken by the defendant; and that the
consideration to be expressed in each deed should be $2,000;
that the defendant should lease and convey to the complainant
the right to cut wood and timber for his own use on certain lands
in the answer after specified; that the complainant should take,
as his own separate property, certain personal estate in the an-
swer after mentioned; and that the residue of the joint personal
property should belong to the defendant; that this defendant
should have all the debts coming to the firm on book accounts or
notes, and should pay all the debts against the complainant and
defendant in Egg Harbor or Galloway, or in New York or Phil-
adelphia, which, as he avers, comprised all or the chief part of
the debts of the firm.

That, in pursuance of said agreement and understanding, he
did, on the 4th of July, 1833, by deed of that date, convey to
the complainant all this defendant's interest in certain tracts or
parcels of land belonging to the firm, which were the same tracts
which the complainant had selected and chosen for that purpose;
and the complainant, in pursuance of their said agreement for
dissolution and division of property, did, by deed of that date,
convey to this defendant all the complainant's right in certain
tracts of land and real estate in said deeds described; and being
the tracts particularly set forth in the complainant's bill.

The agreement here stated as having been made between
them is, that certain lands (the answer does not say what lands)
should remain undivided; that by an interchange of deeds each

should become the sole and separate owner of certain lands; (the answer does not say what lands;) that the complainant should take as his own personal property certain personal estate, and that the residue of the joint personal estate should belong to the defendant; that the defendant should have the debts due the firm, and pay the debts due from it, as aforesaid.

Now, taking this statement only, there is, from its uncertainty, nothing apparent on the face of it that is unreasonable; but the defect of the defendant's case is that it appears that no such agreement was ever carried out. The deed made to the complainant is of the defendant's interest in one tract of 100 acres and another tract of 60 or 70 acres; and the deed from the complainant is of his interest in all the other lands mentioned in the bill, said to be from 6,000 to 7,000 acres; and the defendant has not told us that any other lands remained to be divided. Whatever may have been the agreement which the defendant sets out in his answer, and whenever it may have been made, (the word *about*, as to time, is sometimes used in a wide sense, and something like this agreement may have been talked of at some time prior to July 2, 1833, when the complainant may have been of sound mind,) the result of the deeds was a very different state of things; and how the defendant should have ventured to make such a statement, in view of what was actually done, it is difficult to imagine.

It was perceived, no doubt, that the defendant's statement of the mode in which the agreement was carried out would be imperfect if it did not say something as to what lands the defendant got; and therefore, after stating that the conveyance to him was of complainant's interest in certain lands, he adds, being the tracts set forth in the bill. Now were not those all the lands that belonged to them in common? Were there any lands remaining to be held in common between them? The answer is silent as to this; though the bill calls for an answer showing all the real estate. The necessary conclusion is that the deed to the defendant was for all the lands except what complainant got.

Whatever agreement the defendant may have seen proper to state in his answer, it is evident that the actual result of the papers procured from the defendant corresponds more nearly, if

it does not entirely, with the proposal John testifies to have been made by the complainant to the defendant on the 2d of July, 1833.

The answer then goes on to state that, in further carrying out their said agreement for dissolution and division, the complainant, on the 4th of July, 1833, by bills of sale, conveyed his said interest in the said vessels to the defendant.

Let us now see what the complainant actually got, in what is called the division. By the deed from the defendant to him, he got the one-half of a tract of land of 101 acres, and one-half of what is called the Peggy Leeds tracts, called in the deed 74 1-4 acres. By what is called the article of dissolution, he was allowed 200 cords of pine market wood on Abseccom Landing, two grey horses and gearing, a two-horse wagon, a chair and harness, and the old sorrel horse. By another article, called in the answer a further agreement for the division of property, the complainant was to have his equal half of all the carpenter's tools, vessel screws, plows, harrows, shovels, forks, blocks, &c., (it is so in the agreement,) and of the salt they had on hand, and of the stock of store goods, and the iron at James Smith's and at home ; and a lease of the cleared land on the south side of the mill, except where the surveyor's house stands, with the privilege of cutting market wood within certain boundaries, for five years, or as long as he may want it himself, or his wife Sarah ; and the cedar wood for his own use, and oak timber for firewood, and what lumber he might want for his buildings, that was already sawed. This is the whole of what, by all the papers, the complainant got, in what is called the division of property.

As to all the articles of which his half is allowed him, he, of course, only got what belonged to him ; he was half owner. And his getting his half of any item of property can be no consideration or reason for defendant's getting any more than the other half of the same item of property. This disposes of the carpenter's tools, &c., &c., and store goods ; each was to have his half of them. Next, the complainant was to have 200 cords of pine market wood on the landing. Now the bill charges that there were, belonging to the partnership, 1,000 cords of pine market wood on the landing ; and the answer does not deny it.

The complainant's half, then, of the pine wood on the landing was 500 cords. His being allowed to keep 200 of his own 500 cords can be no consideration for his conveying away the other 300 of his own 500 cords. The defendant would seem to think that his not taking all the defendant's 500 cords was a good reason or consideration for taking 300 cords of complainant's pine wood; and also, by the same rule, I suppose, a good reason, or consideration for taking the whole of the complainant's 800 cords of wood in the woods ready to be made into charcoal, and also the complainant's 750 bushels of charcoal; for the bill charges that the partnership had 1600 cords of wood in the woods and 1500 bushels of charcoal; and the answer does not deny it.

And as to the lumber the complainant might want for his buildings, that was already sawed, allowed him by one of the articles, the bill charges that there was a quantity of sawed lumber at the mill; and the answer does not deny it. Half of it, of course, belonged to the complainant. Whether the complainant's own half of it would not be abundant for his buildings we have no means of telling, from the defect of the answer in not telling us how much there was. As to the live stock, it is clear, I think, that the complainant did not keep his half of that. The defendant got 6 mules, with gear, 4 horses, 3 heavy wagons, one light wagon, one sulkey, some harness with the horses, and a set of ox-chains. These, John says, were the principal articles of personal property his father took possession of. I think this is a very full half of the live stock, as against the complainant's two grey horses and gearing, a two-horse wagon, a chair and harness, and the old sorrel horse.

As to all the personal property, then, which the defendant got from the complainant, including the shares in the vessels, he did not pay one dollar of consideration.

As to the lands, the defendant admits that no money consideration was paid. The parties lived near each other, each living on a farm of about equal value, as it would seem from John's testimony. If the agreement spoken of in the answer contemplated that each should become the separate owner of the farm he lived on, and that the residue of their large landed estate

should remain undivided, all that was necessary to be done was, for the defendant to convey to the complainant the defendant's interest in the farm the complainant lived on, and for the complainant to convey to the defendant the complainant's interest in the farm the defendant lived on. And I am disposed to think, from all the developments in the case, that this may have been, at some time, talked of. Be this as it may, putting the two farms against each other, as equal in value, we have the defendant's conveyance of half the Peggy Leeds place, of 74 acres, *i. e.*, 37 acres of land, without any buildings on it, and what is called the lease and cutting privilege, as a consideration for the complainant's half of 6,000 or 7,000 acres of land, *i. e.*, 3,000 or 3,500 acres, and that, as part of a transaction by which the defendant got, without any consideration whatever, the amount of personal property above stated, besides the debts due the firm over and above the debts due from it, of which the defendant has not seen proper to give in any account; the complainant's shares in the vessels being admitted to have been estimated at $2,150, and the complainant's share of the wood alone, 1100 cords, amounting, I should suppose, to at least $1,000 more.

It is not surprising that the defendant has laid before us such a volume of answer in endeavoring to meet a state of things like this, or to cover it up with words and carefully chosen language. He has, by such an answer, imposed great labor on all who have been put to an examination of it; (and possibly he has hoped that it might escape a thorough examination;) but when the labor of extracting from it the true state of things it discloses is performed, it reveals a case of most extraordinary character.

It would require more time than I have to devote to this case to go through, on paper, with the examination it might be profitable to make of this answer; to show, further, its defects in its answers to the charges of the bill; the insufficiency of its denials; and the allegations contained in it which, in my judgment, have been disproved. Suffice it to say, that I think the term which one of the counsel for the defendant ventured to apply to the bill (a very strong one,) is much more applicable to the answer. Indeed I have not been able to perceive its applicability to the bill at all.

If the results produced by the writings signed by the complainant corresponds with any proposal ever made by him, it is not with what the answer would seem to state the proposal to be, but what John H. Doughty, in his testimony, states the proposal to have been on the morning of the 2d of July, 1833 ; and that proposal, and the manner in which it was met by the defendant, goes far, of itself, to show the truth of the main allegation of the bill, that the complainant was not then of sound mind and competent for the transaction of business, and that the defendant was fully aware of this. I think that, independently of the testimony in the cause, one could hardly read John's account of what passed at that interview without inquiring whether the complainant was in his right mind.

The answer says that " certain" lands were to be taken by each party, leaving the rest of the lands to remain undivided between them ; and that " certain" personal property was to be taken by the complainant, and the residue of the personal property by the defendant ; and that, in pursance of the said agreement, the defendant's interest in *certain* lands was conveyed to the complainant, and the complainant's interest in *certain* lands was conveyed to the defendant, being the lands mentioned in the bill ; and that, by other writings, the complainant got 200 cords of wood, his half of some personal property specified, two grey horses, &c., as above, and the defendant got all the rest of the personal property ; the complainant also getting the lease and cutting right specified. This is the blind shape of the answer. It is not the answer which the bill required. The bill required the defendant to state all the property, real and personal, that belonged to the partnership ; and to state what the complainant got and what the defendant got ; and to state what, by any agreement set up in the answer, the complainant was to get, and what the defendant was to get. To say that by an agreement the complainant was to have *certain* lands, and the defendant *certain* other lands, being the lands mentioned in the bill, without saying whether those other lands got by the defendant were all the lands except what complainant got, is not sufficient under such agreements as he sets up, showing that certain lands were to remain undivided.

The reason of the peculiar shape of this answer is manifest. To do what the bill plainly requires, state all the property, real and personal, which belonged to the parties in common, say 6,000 acres of land, vessels the interest of the complainant in which was estimated at $2,150, 2,600 cords of wood, each one's half therein being 1,300 cords, &c., (without now stating the other personal property;) then to say that in pursuance of an agreement that certain of the real estate should be divided, leaving the residue of the real estate in common, and that complainant should take certain personal property, and the defendant all the rest, the complainant's own half of a small part of the real estate was conveyed to the complainant, and he, the defendant, took all the rest of the land, and that, of the said wood, the complainant retained 200 of his own 1300 cords, and the defendant took all the rest, and took also the interest of the complainant in the vessels, valued at $2,150, and that the complainant retained his half of certain other personal property ; to make this statement plainly was more than the defendant's courage was equal to. And yet this is the result of the answer when its involution is unraveled. It is emphatically a most extraordinary case ; such a one as I have never met with in my experience or reading ; I mean the case developed by the answer alone.

The only satisfactory solution of the question how such a division of property could have been obtained by the defendant and submitted to, nay, it is said, proposed by the complainant, is to be found in the testimony as to the condition of the complainant, in body and mind, at the time it was made.

I am clearly of opinion, that the testimony, if not of itself sufficient, (I am inclined to think it is,) yet, taken in connection with the unconscionable character of the so-called division, is entirely sufficient to show that the complainanant was incompetent for the transaction of business. I do not propose to enter upon a minute examination of the testimony.

But, it is not necessary for me to say that the complainant was absolutely *non compos mentis,* to entitle him to relief in such a case as this. He was, to say the least, by long intemper-

ance and severe sickness, producing frequent convulsions, reduced to a very low state of weakness of body and great imbecility of mind; the defendant was his elder brother, who had long been a partner with him in business, and therefore in a relation to exercise great influence over him ; and the bargain was such as no honest and fair man would ·think of proposing, or ought to be willing to accept. In this case it is said it was proposed by the complainant. If it was, the proposal was, in itself, so strong evidence of imbecility or delusion that no man should have accepted it.

Relief in equity on such and similar grounds has been granted in numerous cases ; and Courts of Equity have frequently inferred fraud from circumstances less conclusive than the facts in this case. 2 *Harr. & John.* 422; 2 *Harr.* 502; 2 *Litt.* 118 ; 1 *Aik.* 390 ; 1 *Munf.* 557 ; 6 *Harr. & John.* 435; 14 *John. Rep.* 527; 6 *Yager,* 75 ; 2 *Root,* 216.

The defendant's counsel, pressed with this view of the case, argued that the case made by the bill was a case of total insanity and no consideration whatever, and not a case of imbecility and inadequate consideration; and that the case as made in proof did not come up to the case charged in the bill; and that, if it did not, the court could not relieve on the ground of imbecility and inadequate consideration, however great the imbecility or however gross the inadequacy. This argument cannot prevail. The bill charges that the complainant was deprived of his right reason, and was of unsound mind and totally incapable of transacting any business, or of the government of himself and management ·of his affairs. I have intimated before that, to my mind, the proof comes up to this charge. But if it does not, but comes up to the state of mental imbecility I have before stated, sufficient under the circumstances to call for relief, I know of no rule or reason why relief for such cause should not be granted under such a charge as is made in the bill. Relief in such cases cannot depend on the question whether the precise degree of imbecility charged in the bill is proved. Imbecility calling for relief under the circumstances may be proved, and acted upon by the court, though it be not the degree of imbecility charged. But

I do not understand the charge in the bill to be a charge of total insanity.

As to consideration, the bill states that the complainant and defendant were seized of certain lands and possessed of certain personal property mentioned in the bill; that after the complainant recovered from his affliction, the defendant, to his surprise, informed him that he had, on the 4th of July, 1833, not only executed a bill of sale of all his right to the said personal property, but also a deed for all his right in the said real estate; that the complainant then told the defendant, if such was the case, the defendant well knew that the complainant had received no consideration therefor and that both were fraudulent. And the bill afterwards states, that the complainant has never received any consideration money from the defendant for the said personal property or the said real estate.

Now it is admitted by the defendant that not one dollar of the consideration money mentioned in the deed and bills of sale from the complainant to the defendant was ever paid; and I have shown that as to the personal property not a particle of any consideration whatever, money or other, was ever paid or given. But it is said there was some consideration, though not a money consideration, for the deed. What was the consideration? The complainant and defendant were owners in common of numerous and some of them large tracts of land. Is the conveyance by one, of his interest in one tract, so that the other may become the sole owner of that tract, a consideration for anything more than a conveyance to him of the other's interest in a tract of equal value, so that he may become the sole owner of that? Would it be a consideration on which the conveyance to him of all the lands they held in common, however extensive, could rest? It is different from the case of a sale; it is a division to the extent of each taking an equal portion of property; and beyond that it is as if the rest of the lands remained in common and the one gets a deed for the other's interest in those remaining lands without any consideration. As to what is called the lease and cutting privilege on a small portion of the lands held in common, it is only retaining a small part of his own, a small portion of the number of acres his own half would give him; and it is no more

a consideration for the conveyance of the residue of his interest than the omission of the defendant to include all the complainant's lands in the deed would have been a consideration for the parts included in the deed. The complainant was allowed to retain a small interest in a small part of his own ; and this is claimed to be a consideration for all his interest in all the rest of his own; or in other words, the defendant's not taking all that belonged to the complainant is claimed to be a consideration for what he did take.

But I see nothing in the case which should induce the court to refuse relief on this ground. It will hardly be expected that the court, in such a case, could deny relief on so refined a position.

Again, it was contended that the complainant was too late in his application for relief ; that twelve years elapsed before he filed his bill. It might be a sufficient answer to this to say, that the defendant sets up no such ground of defense in his answer ; but applies himself seriously to the sustaining of the transaction in all its length and breadth. But another, and I think quite sufficient answer, is furnished by the pleadings and proofs in the case. The bill states that notwithstanding the deed, the defendant and complainant continued to cut upon the said property, and use and occupy the same after the same manner as had been done previous to June, 1833, up to July, 1844. That in or about July, 1844, the defendant ordered the sawyer at the mill not to saw any logs the complainant might have brought to the mill, and took the exclusive possession thereof and forbid the complainant and his workmen from cutting upon or using the aforementioned premises.

The answer says, that the defendant, at different times, requested the complainant to account to and settle with him for various matters and transactions had and done between them since the dissolution, but the *defendant* (meaning the complainant) has always refused to do so ; and that, in order to compel a settlement, the defendant was at length compelled to bring a suit, and did so. That neither the complainant nor any other person has cut on said lands, or used the same, unless by the defendant's consent, without being held by him as a trespasser. That the complainant has, at different times, cut wood on said lands, but

only by permission of this defendant, and in such manner and at such times and places as this defendant permitted, or, if he has cut without such permission, it has only been as a trespasser. That for the wood and timber so cut he has always expected the complainant would pay him, and that the complainant never alleged that he had a right to such land as part owner thereof, until about the time the defendant sued him. This is a fair specimen of the answer throughout. It is no answer to the charge, and must be considered an admission of it. Did the complainant ever ask his permission to cut? Did the defendant ever tell the complaint he was a trespasser, or ever forbid his cutting until just before he sued the complainant? And was it not on being then forbidden that the complainant claimed his right, as part owner of the land, notwithstanding the deed?

So, as to sawing the lumber at the mill, the same kind of attempt to answer the charge in the bill is made. He says the complainant has, also, since the dissolution, had considerable lumber sawed at the mill, and then adds, immediately, and has had sundry other dealings with this defendant by means whereof he has become largely indebted to him, and has, also, dealt considerably with the firm of E. D. & Son, at their store and in other ways, and is now indebted to them in a considerable sum; and then says that, the complainant having been repeatedly requested to come to an account and settlement of said accounts, and to pay what was in arrear and due them, (without saying when requested,) and having always refused so to do, he and the said firm of E. D. & Son were at length compelled to resort to compulsory measures. That accordingly he directed the sawyer at the saw mill to saw no more lumber for the complainant without orders from him, the defendant, and forbid the complainant and his workmen from cutting on said lands; and he and the said firm of E. D. & Son each commenced an action against the complainant, to recover from him the sums so due them, and which he always neglected and refused to account for and pay. Now all this, instead of being a denial, shows, substantially, the truth of the charge in the bill, that, notwithstanding the deed to the defendant, the complainant continued to cut wood on the lands mentioned in the deed; to haul timber to the mill there-

from to be sawed; and to get his groceries and goods at the store. The complainant seems carefully to avoid saying when it was that he forbid his cutting &c. The bill says it was not till 1844. The answer does not deny this. It must be taken as true, then, that things went on as above stated until 1844. And such a state of things certainly furnished strong grounds for a brother to expect or at least to hope, that a brother did not intend to enforce, or attempt to enforce against him, writings of so unconscionable a character as those which had been procured from him in his imbecility, when away from his family, and without any knowledge on their part of their contents. I say this with assurance, notwithstanding the effort in the answer and in a part of the testimony, to induce a belief that the complainant's wife was made acquainted with the contents of the papers. As to the bills of sale, there can be no pretence that the wife knew anything about them, or of any intention to have such papers executed. They were not drawn till after the complainant and defendant got to Doctor Canfield's; and it does not appear that anything was said to her, or even to the complainant, about such papers, before the complainant and defendant left the complainant's on the morning of the day on which the papers were executed. And as to the deed from the complainant for the lands therein specified having been read by the complainant's wife, or even by the complainant himself, the idea is utterly inadmissible by any one who will read that deed and the testimony as to what passed at the complainant's house, on the morning of that 4th of July, and as to the time between the defendant's going there and the complainant's leaving with him.

And, besides the answer to the charge of the bill as to the reason of the delay, we have the testimony of witnesses, at least two, who testify to their being employed in cutting under the direction of the complainant, and that the defendant did not forbid them. I am of opinion that the silence of the defendant, and his acquiescence in the course pursued by the complainant is a course amounting to a continual affirmation of the complainant's right notwithstanding the deed, and to a continual reproach on the defendant and expression of a belief that he would not attempt to enforce the deed; and form, if not a justification for the

complainant's delay, yet an excuse in view of which the court cannot, in a case like this, refuse its aid. 1 *Story*, sec. 529. The time within which a fraudulent transaction may be asked to be set aside depends on circumstances and the sound discretion of the court. *White's Eq. Ca.* 144, 5. Indeed, a distinguished Chancellor, in 2 *Eden's Rep.* 280, said, that delay would never purge a fraud while he sat in the court; that every day added to the injustice and multiplied the oppression.

But in this case the lapse of time is entirely too short to defeat the complainant on the ground of delay. No case can be found in which such a lapse of time in such a case was held to be a bar.

And I think the circumstances, above mentioned, accounting for the delay, in connection with the fact that the defendant has not in his answer asked any protection on account of delay, are sufficient to induce the court not to interpose the objection of delay from any considerations of policy, even in reference to the bills of sale for the personal property. It was all one connected transaction; and I think it should be wholly declared fraudulent and void.

But I am unwilling to consider the partnership as subsisting in reference to the personal property. It will be held to have been dissolved on the 4th of July, 1833.

The defendant will be directed to account for half the rents and profits of the lands, other than the respective farms on which the parties reside, and for half the proceeds of the wood and timber taken therefrom; and for the value of the complainant's share of the vessels; and for the complainant's half of the other personal property to an extent sufficient to make up, with what he got, the half of it.

Order accordingly.